**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Victor Montano DISLA,**
**Defendant-Appellant.**

**No. 85–5256.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1986.

Decided Dec. 8, 1986.

Eugene G. Iredale, San Diego, Cal., for defendant-appellant.

Before ANDERSON, POOLE and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Victor Montano Disla ("Disla") appeals from his convictions for conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I); possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count II); aiding and abetting the possession of cocaine with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) (Count III); and wire fraud, in violation of 18 U.S.C. § 1343 (Count IV). Disla argues that the admission into evidence of certain physical evidence and a statement he made after his arrest violated the fourth and fifth amendments of the Constitution. He also challenges the sufficiency of the evidence as to Counts I and III. We hold that the district court did not commit reversible error in denying Disla's constitutional challenges. We affirm as to Counts I, II and IV. We reverse as to Count III.

## I

### FACTS AND PROCEEDINGS

Investigators at Pacific Bell suspected that a "blue box" was being used at the telephone located at 602 Anita Street in San Diego (the "Anita Street apartment"). A "blue box" is an electronic device used to bypass the billing system for long-distance calls. Inspector Aldo Nevarez, a security investigator for Pacific Bell, obtained a search warrant from the state municipal court to search the apartment. The warrant authorized a search for:

1. A "blue box;"
2. Tape recorders and tapes containing recorded multi-frequency tones;
3. Electronic circuit diagrams, instructional material and electronic components used to construct the "blue box;"
4. Any material, "printed or otherwise," which make reference to "blue boxing," "phone hacking," or "phone phreaking;"
5. Phone directories, phone lists, or phone numbers consisting of specified numbers.

Officers at the San Diego Sheriff's Office assisted in the execution of the warrant which took place on April 16, 1985. None of the officers was involved in drug enforcement or suspected that drugs might be found at the Anita Street apartment. The officers met with Nevarez before the search and passed around the warrant. Nevarez told them that a "blue box" "could be a medium-sized tape recorder down to as small as a pack of cigarettes, or even smaller...." Nevarez also stated that a "blue box" would be hard and not flexible to the touch, and that it could be located virtually anywhere in the apartment. One of the officers testified that the search warrant

authorized the search for a "blue box, item for making long-distance phone calls, along with possibly tape recorders or bits and pieces of paper with specific phone numbers written on them."

The officers searched the apartment and discovered several items:

**a. Cocaine in Sock**—Officer Macleod opened a dresser drawer in the master bedroom. The drawer contained watches and other small items. He also saw a pair of black socks in the drawer. They had been folded over and were the only clothing item in the drawer. When he pushed one of them aside, "it felt much heavier than a normal sock would feel, so I opened up the sock to see what was in it, suspecting that it might be this box." Macleod said that he did not squeeze the sock, but that when he picked it up he noticed its weight and felt a "cushioning effect." Macleod opened the sock and discovered a clear plastic bag containing a white substance. The white substance was later identified as 103 grams of cocaine.

**b. Identification Items**—Officer Anderson found a passport and an alien registration card in the same drawer where the cocaine was found. Disla's name appeared on both documents, and the Anita Street apartment was listed as his address.

**c. Cocaine Behind Stove**—Officer Gassaway searched the kitchen and noticed that the stove was off-line from the wall. He slid the stove away from the wall and found a white plastic shopping bag. It contained several clear plastic bags each containing a white substance. Gassaway testified at a pretrial hearing that he did not recall whether the shopping bag was open when he found it, but he later testified that the bag was in fact open. Gassaway recalled that the white shopping bag (which contained the clear plastic bags) was "soft to the touch." The white substance in the clear plastic bags was later identified as 912 grams of cocaine.

**d. Money Under Refrigerator**—Officer Gassaway also found a brown grocery-size bag containing about $26,000 in bundled money under the refrigerator.

After the officers discovered the cocaine and money, Nevarez halted the search and obtained a new search warrant authorizing a search for drugs. The officers resumed the search only after a new warrant was obtained. They found an empty container for 500 grams of lactose which is commonly used to dilute cocaine. Numerous photographs of appellant Disla were also found in the apartment.

While the police were still at the apartment, Officer Zamora spoke with several neighbors and obtained a description of the individuals residing there. Zamora knew that cocaine had been discovered. Disla and his brother, Julio Disla, drove up to the apartment in a Datsun 510, got out of the car and began walking toward the Anita Street apartment. Zamora testified that when Disla made eye contact with him Disla turned and began walking away. Disla denied making a furtive gesture and claimed he was only walking toward the mailbox. Zamora arrested and searched Disla. Disla had in his possession a "Gencom Beeper," a $20 bill torn in half, $709 in cash, a ring inscribed with the name "Cuto" (subsequently determined to be Disla's pseudonym), a key to the Anita Street apartment, and a phone list with numerous names. Zamora arrested Disla, handcuffed him, and took him into the apartment. Before Disla was advised of his *Miranda* rights, Zamora asked him his name, age, address and employment status. These questions were contained in a "DEA 202 Form" which Disla was asked to complete. Disla stated he resided at the Anita Street apartment.

Disla was incarcerated in the Metropolitan Correctional Center at San Diego, California on the day of his arrest, April 16, 1985, and he remained in custody at the facility from that time through his trial and sentencing.

On April 24, 1985, Officer Gouge observed an individual identified as Victor Franco get into the car which Disla left at the Anita Street apartment. Franco drove the car to his residence at 3467 Newton Street, San Diego (the "Newton Street

apartment"). Gouge discovered that Disla was listed as the owner of the car on the Department of Motor Vehicles registration certificate, and the Newton Street apartment was the address shown on the certificate.

Telephone records from the Metropolitan Correctional Center established that between May 5 and May 8, 1985 about forty collect telephone calls had been made from the twelfth floor of that facility (the floor on which Disla was housed) to the Anita Street apartment. The phone records also revealed that several calls had been made from the twelfth floor of the Metropolitan Correctional Center to the Newton Street apartment and to an apartment at 574 Castleman Street, Chula Vista (the "Castleman Street apartment"). There was no evidence as to the content of the calls.

On May 5, 1985, a telephone call was made from the Castleman Street apartment to the phone number of the residence of Porfirio Rene Garcia in Brooklyn, New York. A telephone call had previously been made from the Castleman Street apartment to Garcia's New York residence on January 19, 1985. Disla testified he lived at the Castleman Street apartment from the time he arrived in San Diego in late 1984 until his arrest in April 1985. His passport showed that he was outside the United States of America when the January 19, 1985 telephone call was made.

On May 8, 1985 (while Disla was still in jail), Garcia and his companion, Jose Diaz, went to the American Airlines ticket counter at a New York airport, paid cash for two one-way tickets to San Diego, and checked in a bag for transportation on the flight. Officials at the New York airport observed that Garcia and Diaz looked nervous. Unknown to the two of them, the bag they had checked was searched at the New York airport. Officials there discovered 600 grams of cocaine and alerted authorities in San Diego. When Garcia and Diaz arrived at the San Diego airport the two were arrested. A post-arrest search of Garcia revealed he was carrying a San Diego bus schedule. Written on the schedule were directions to the Newton Street apartment and the name "Victor." Appellant

Disla's first name is "Victor," and "Victor" is also the first name of Victor Franco, an uncharged co-conspirator in Count I and named but uncharged in Count III. Victor Franco lived at the Newton Street apartment.

On May 9, 1985, two calls were made from the Castleman Street apartment to Garcia's residence in Brooklyn. Two more calls were made to the same address two days later. Phone records from the Metropolitan Correctional Center indicated that eight telephone calls were made from the twelfth floor of that facility to the Castleman Street apartment between May 10 and May 12.

In August 1985, Disla was indicted (by superseding indictment) on four counts. Count I alleged a conspiracy among Disla, Jose Diaz, two uncharged co-conspirators, Porfirio Garcia and Victor Franco, and other unnamed persons to possess cocaine with intent to distribute (21 U.S.C. §§ 841(a)(1) and 846). Count II charged Disla with possession of the cocaine discovered at the Anita Street apartment on April 16, 1985 (id. § 841(a)(1)). Count III charged Disla and Jose Diaz, and two named but uncharged persons (Porfirio Garcia and Victor Franco) with possession of the cocaine seized at the San Diego airport on May 8, 1985 (id. § 841(a)(1) and 18 U.S.C. § 2). Count IV charged Disla with wire fraud in using the "blue box" (18 U.S.C. § 1343).

Before trial, Disla moved to suppress the cocaine seized at the Anita Street apartment. The district court denied the motion, finding: "I think, based on the evidence that I heard, that the search was valid. The affidavit was sufficient to support the issuance of the warrant. I would find that the contraband which was uncovered during the course of the search was uncovered as being in plain sight when the officers were lawfully on the premises." The district court also denied Disla's motion to suppress the statement he made to Officer Zamora immediately following his arrest in which he stated he resided at the Anita Street apartment. The district court also

denied his motion to sever the wire fraud count from the other counts.

At trial, the government introduced the following evidence in addition to that already mentioned: Two neighbors who lived at the Anita Street apartment identified Disla as the person they most frequently saw at the Anita Street apartment; Disla's car was listed with the Anita Street apartment complex as the car authorized to be parked in an assigned parking space at that complex; Disla's brother (Jose Disla) had rented the Anita Street and Castleman Street apartments using a false name ("Angel Garcia"); police had intercepted a call from the Anita Street apartment on April 1, 1985 in which the speaker identified himself as "Cuto," Disla's pseudonym; "Gencom Beepers" and torn one-half $20 bills, which Disla was carrying at the time of his arrest, are commonly used in narcotics conspiracies, the torn bill acting as a receipt to ensure that the correct party gets delivery of narcotics for which he has prepaid; Disla had about $9,000 in his bank account in addition to the $709 he was carrying at the time of his arrest. He accounted for the money by stating he occasionally helped a friend do mechanical work, but in an affidavit he had signed for the court at the time of his arrest he swore he had not had a job for the past twelve months and had received no income from self-employment.

After the close of the government's case, Disla renewed his motions for severance and for dismissal of all counts. He also requested that the court order immunity for Porfirio Garcia in exchange for Garcia's testimony which he contended was necessary and would be exculpatory. The district court denied these motions.

In his defense, Disla presented testimony from Jose Hanono, the apartment manager of the Castleman Street apartment. Hanono testified that Disla's brother originally rented the apartment, subsequently moved to the Anita Street apartment, and that thereafter Disla moved into the Castleman

Street apartment. Two of Disla's friends also testified that he lived at the Castleman Street apartment. Disla testified on his own behalf. He denied any personal involvement in a drug conspiracy. He stated that he followed his brother to San Diego in late 1984. He acknowledged knowing Victor Franco socially, but denied knowing Porfirio Garcia or Jose Diaz. Disla also stated he had keys to the Anita Street apartment because he was taking care of the apartment in his brother's absence, but that he lived at the Castleman Street apartment. He testified he came to the Anita Street apartment at the time of the search (the day he was arrested) to "check the mail." On cross-examination, Disla stated he spent a great deal of time at the Anita Street apartment, and suspected his brother might be involved in drug transactions. Disla knew that his brother had used a false name in renting the Anita Street and Castleman Street apartments. He also knew his brother had made several trips to New York. Disla testified he had lied about living at the Anita Street apartment at the time of his arrest "to protect my brother."

The jury returned verdicts of guilty on all counts.[1] Disla appeals his convictions on all counts.

## II

### ISSUES

We consider the following issues:

A. Did the search of the Anita Street apartment and seizure of the cocaine found in that search violate the fourth amendment?

B. Did the questioning of Disla after his arrest violate *Miranda,* and if so, was the admission of Disla's statements harmless error?

C. Was the evidence sufficient to convict Disla on Counts I and III?

---

1. In its verdict on Count III (possession of cocaine at the San Diego airport on May 8th when Disla was in jail) the jury found Disla "guilty of aiding and abetting possession of cocaine with intent to distribute on or about May 8, 1985, as charged in Count ... [III].…" Disla was charged in Count III of the indictment with possession of cocaine on May 8, 1985 with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

D. Did the district court abuse its discretion in denying Disla's motion to sever Count IV from the other counts?

E. Did the district court err in denying Disla's request for immunity for Garcia?

## III

## ANALYSIS

A. *Search and Seizure of Cocaine and Money*

■ The warrant obtained by Inspector Nevarez to search the Anita Street apartment did not authorize the search for money or cocaine. The district court held, however, that the search and seizure of those items was permissible under the "plain view" exception to the warrant requirement. We review this mixed question of law and fact de novo. *United States v. Merriweather*, 777 F.2d 503, 505 (9th Cir. 1985) (*citing United States v. Humphrey*, 759 F.2d 743, 749 n. 15 (9th Cir.1985)), *cert. denied*, — U.S. ——, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986)).

■ To admit evidence under the "plain view" exception, the officers must be in a lawful position to view the items seized, the incriminating character of the evidence must be immediately apparent, and the discovery must be inadvertent. *See, e.g., United States v. Washington*, 782 F.2d 807, 815 (9th Cir.1986); *United States v. Chesher*, 678 F.2d 1353, 1356 (9th Cir. 1982). We have stated that the "primary requisite for the application of the plain view doctrine is that the police officer has a right to be where he is when he sees the evidence." *United States v. Blalock*, 578 F.2d 245, 248 (9th Cir.1978). The search must be " 'one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed.' " *United States v. Alexander*, 761 F.2d 1294, 1302 (9th Cir.1985) (*quoting Gurleski v. United States*, 405 F.2d 253, 258 (5th Cir.1968), *cert. denied*, 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969)). Police may search all items which legitimately might contain the objects specified in the warrant. *See United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); W.R. LaFave, *Search & Seizure* § 410, at 154 (1978 & Supp. 1986).

■ The warrant in this case authorized the search for a "blue box" and several other items including diagrams, directories, phone lists, or phone numbers. All of the officers who conducted the search reviewed the warrant and were aware it authorized a search for these items. The officers who conducted the search and seized the cocaine could logically conclude that the "containers" which held these items (the sock and shopping bag) could contain the items specified in the warrant. Officer Macleod testified the sock was heavier than normal; he lifted but did not squeeze it before opening it. Similarly, officer Gassaway testified that the white shopping bag containing the cocaine was heavy but he did not squeeze it. Both officers testified that these items were "firm" and unusually "heavy." The evidence indicates that the discoveries were inadvertent and that the incriminating character of the money and white substance was apparent. We agree with the district court that the officers could reasonably conclude that the "blue box" or paper items covered by the warrant might be contained therein, and that therefore the evidence was admissible under the "plain view" doctrine. *See Gomez-Soto*, 723 F.2d at 653 (police could inspect contents of briefcase); *United States v. Issacs*, 708 F.2d 1365 (9th Cir.) (*passim*, search of ledgers), *cert. denied*, 464 U.S. 852, 104 S.Ct. 852, 78 L.Ed.2d 150 (1983); *United States v. Hillyard*, 677 F.2d 1336 (9th Cir.1982) (*passim*, inspection of books).

B. *Post-Arrest Statements*

We next consider Disla's contention that the district court erred in admitting his statement made after arrest that he lived at the Anita Street apartment. The government stipulated before trial that officer Zamora did not read Disla his *Miranda* warnings before asking him ques-

tions from the "DEA 202 Form." We have recently stated that whether questioning constitutes interrogation presents a mixed question of law and fact which we review de novo when there is no factual dispute as to what questions were asked, whether *Miranda* warnings were given, or what answers were given. *United States v. Poole,* 794 F.2d 462 (9th Cir.1986). *But see United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985) (district court's ruling reviewed for clear error; *citing United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)); *United States v. Combs,* 762 F.2d 1343, 1348–49 (9th Cir.1985).[2]

█ A defendant who is placed in custody must receive *Miranda* warnings before being subject to interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The routine gathering of background or "booking" information ordinarily does not constitute interrogation. *United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir.1981). *See also United States v. Perez,* 776 F.2d 797 (9th Cir.1985). However, the "ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response." *Booth,* 669 F.2d at 1238. The officer's intent in asking the question is relevant, but not decisive. *Id. See also United States v. Mata-Abundiz,* 717 F.2d 1277, 1280 (9th Cir.1983).

█ The facts here indicate that officer Zamora should have known that the question regarding Disla's residence was reasonably likely to elicit an incriminating response. Zamora knew that a large quanti-

ty of cocaine and cash had been found at the Anita Street apartment and that the resident(s) of the apartment had not been identified. After the cocaine and cash were discovered, Zamora asked neighbors for a description of the persons who lived at the apartment and observed Disla and his brother approach the apartment building. Zamora arrested Disla, asked him several investigative questions,[3] and then requested that Disla answer the name, age, residence, and employment status questions from the "DEA 202 Form." The questioning here did not arise in a routine "booking" setting. *See Perez,* 776 F.2d 797; *United States v. Gonzalez-Mares,* 752 F.2d 1485, 1489 (9th Cir.1985). Further, the question as to where Disla lived was related to an element (possession) of the crime that Zamora had reason to suspect Disla committed. *Mata-Abundiz,* 717 F.2d at 1280. In light of both the context of the questioning and the content of the question, we must conclude that Disla was subjected to interrogation.

█ We hold, however, that the district court's admission of Disla's statement was harmless beyond a reasonable doubt. *See Rose v. Clark,* — U.S. —, —, 106 S.Ct. 3101, 3105–07, 92 L.Ed.2d 460 (1986); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Disla's conviction for possession of the cocaine at the Anita Street apartment was based upon much more than a finding that he lived there. Apart from Disla's statement, the government presented overwhelming evidence tying Disla to the Anita Street apartment and hence proving his possession of the cocaine found there.[4] This evidence included: Disla's passport and alien registration card were found in the drawer

---

2. Our resolution of this issue does not depend upon which of these standards of review is applied.

3. The government did not attempt to introduce Disla's responses to these questions.

4. The government did impeach Disla with his post-arrest statement on cross-examination, and referred to this at closing argument. However, Disla stated he lived at the Castleman Street apartment in direct examination, and his coun-

sel introduced several witnesses and documents to that effect in his case-in-chief. The government was thus permitted to impeach Disla with this statement, notwithstanding the *Miranda* violation. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *United States v. Whitson,* 587 F.2d 948, 951–52 (9th Cir.1978) (government may impeach regardless of *Miranda* violation where defendant raises issues). Even if the impeachment was impermissible, we hold it was harmless error.

which contained the cocaine; the Anita Street apartment was listed as Disla's address on these items; Disla's pictures were found in the apartment; Disla carried a key to the front door of the apartment on his key ring; Disla's car was listed with the apartment complex as the vehicle authorized to be parked in the parking space assigned to the Anita Street apartment; Disla was intercepted using the "blue box" to make a telephone call from the apartment on April 1, 1985; and neighbors identified Disla as being frequently seen there. We therefore hold that the district court did not commit reversible error in admitting the statement made in violation of *Miranda. See generally United States v. Miranda-Uriante*, 649 F.2d 1345, 1350 (9th Cir.1981) (cumulative declarations); *United States v. Cornejo*, 598 F.2d 554, 557 (9th Cir.1979) (same).

## C. *Sufficiency of Evidence*

Disla also challenges the sufficiency of the evidence for his convictions on Counts I and III. A conviction is supported by the evidence if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences, there was relevant evidence from which the jury could reasonably have found the defendant guilty beyond a reasonable doubt. *United States v. Cusino*, 694 F.2d 185, 187 (9th Cir.1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983).

### 1. *Count I—Conspiracy*

Count I alleged a conspiracy among Disla, Jose Diaz, two uncharged co-conspirators (Porfirio Garcia and Victor Franco), and other unnamed persons, to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Disla argues that the government failed to prove he conspired with these individuals because he was in jail during the time some of his alleged co-conspirators committed the acts in furtherance of the conspiracy. We disagree.

A conspiracy is " 'an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent

necessary to commit the underlying substantive offense.' " *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir.1984) (*quoting United States v. Friedman*, 593 F.2d 109, 115 (9th Cir.1979), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985)); *United States v. Ochoa-Torres*, 626 F.2d 689, 692 (9th Cir.1980). In reviewing the sufficiency of the evidence, we must ask whether *any* rational trier of fact could have found Disla guilty beyond a reasonable doubt of the essential elements of the charges. *Id. See also United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir.), *cert. denied sub nom., Moore v. United States*, — U.S. —, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985).

A conspiracy may be proven by circumstantial evidence that the defendants acted together with a common goal. *Id.* "A formal agreement is not necessary; rather the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence." *Bibbero*, 749 F.2d at 587 (*citing United States v. Clevenger*, 733 F.2d 1356, 1358 (9th Cir.1984)). The government need not prove that each conspirator personally participated in every overt act within the conspiracy. *United States v. Burreson*, 643 F.2d 1344, 1348 (9th Cir.), *cert. denied sub nom., Channell v. United States*, 454 U.S. 830, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981).

The government produced sufficient evidence from which a rational trier of fact could conclude that Disla was a member of the charged conspiracy. The amended indictment listed some twelve separate overt acts revolving around two incidents: (1) the April 16th discovery and seizure of 103 grams of cocaine and $26,000 in cash at the Anita Street apartment and Disla's arrest outside that apartment; and (2) the May 8th arrest of Porfirio Garcia and Jose Diaz at the San Diego airport and the seizure of 600 grams of cocaine and a map with the name "Victor" and the address of the Newton Street apartment on it.

The evidence indicates that Disla came to San Diego from New York in December

1984; although unemployed until the time of his arrest, he had accumulated more than $9,000 in savings. Disla knew that his brother, Jose, had rented the Castleman and Anita Street apartments using an alias ("Angel Garcia"). Disla and his brother spent considerable time at both apartments. In January 1985, a call was made from the Castleman Street apartment to Porfirio Garcia's apartment in New York; Garcia was later arrested at the San Diego airport in possession of 600 grams of cocaine and directions to the Newton Street apartment. In April of that year, Disla's voice was identified as making a telephone call under the pseudonym "Cuto" from the Anita Street apartment using a "blue box." "Blue boxes" are often used in drug conspiracies to hide the existence of calls. Disla was arrested outside the Anita Street apartment immediately after police had seized 103 grams of cocaine there. He was carrying a torn $20 bill and a "Gencom Beeper" at the time of the arrest.

Shortly after Disla's arrest, Victor Franco (who Disla admitted was a friend of both his brother and himself) arrived at the Anita Street apartment and took Disla's car to the Newton Street apartment. The Newton Street apartment was shown as Disla's address on the Department of Motor Vehicles registration for that automobile. On May 8, 1985, approximately three weeks after Disla's arrest, Porfirio Garcia and Jose Diaz arrived at the San Diego airport with a cache of cocaine and a map with the name "Victor" and the address of the Newton Street apartment written on it. Several days before and after the arrival of Garcia and Diaz at the San Diego airport with the cache of cocaine, numerous collect calls were made from the twelfth floor of the Metropolitan Correctional Center where Disla was housed to the Newton Street, Anita Street and Castleman Street apartments. Telephone calls were also made from the Castleman Street apartment to Porfirio Garcia's address in New York during the same time frame the calls were made from the Metropolitan Correctional Center to the Newton Street, Anita Street and Castleman Street apartments.

Viewing this evidence in the light most favorable to the government, a rational trier of fact could conclude that Disla was a member of an ongoing conspiracy to possess and sell cocaine. *See Burreson,* 643 F.2d at 1348. The government produced sufficient evidence to demonstrate that the various overt acts were linked by a single conspiracy to which Disla belonged. *See Bibbero,* 749 F.2d at 587 (issue of single conspiracy involves multi-factor analysis including "nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals"); *United States v. Arbelaez,* 719 F.2d 1453, 1458 (9th Cir.1983) (same), *cert. denied sub nom., Ponce de Leon v. United States,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). The evidence reveals the existence of a common scheme (the possession and sale of cocaine), a close association among several of the key conspirators (Disla, Victor Franco, and Jose Disla, an unnamed conspirator), frequent contacts among several of the conspirators, a common modus operandi (covering up the identity of the participants by use of aliases, *i.e.,* "Cuto," "Angel Garcia," and preventing the tracing of participants by use of the "blue box" and by individual participants using different addresses), and a commonality of time and goals. That the government did not demonstrate that all of the conspirators committed all of the overt acts does not defeat the government's case. *See, e.g., Bibbero,* 749 F.2d at 587. We therefore affirm Disla's conviction on Count I.

### 2. *Count III—Possession*

Count III charged Disla with possession of the cocaine seized at the San Diego airport on May 8, 1985. Disla argues the government failed to prove possession because he was in jail at the time the cache of cocaine was seized and the government established (at most) a minimal connection between him and that event. At oral argument, the government argued that Disla's conviction on Count III was supported by three independently sufficient theories:

*first,* Disla was criminally liable for the substantive offenses committed by his co-conspirators in furtherance of the conspiracy, *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *second,* Disla had "constructive possession" of the cocaine even though he was in jail when it was seized; *third,* Disla "aided and abetted" the May 8th transaction. The record reveals, however, that the government did not request, nor did the district court give, a so-called *Pinkerton* instruction to the jury. The government's failure to obtain this instruction precludes our consideration of this theory as a ground for affirmance. *United States v. Batimana,* 623 F.2d 1366, 1369–70 n. 2 (9th Cir.) (*citing Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949)), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). We therefore consider the government's two remaining theories.

### a. *Possession*

■■■■■ Possession of a controlled substance under section 841(a)(1) "may be constructive, as well as actual." *United States v. Grayson,* 597 F.2d 1225, 1229 (9th Cir.), *cert. denied sub nom., MacGregor v. United States,* 444 U.S. 873, 100 S.Ct. 153, 62 L.Ed.2d 99 (1979); *United States v. Morando-Alvarez,* 520 F.2d 882, 884 (9th Cir.1975). The term "constructive possession" does not connote a legal fiction. Rather, the term simply reflects the common sense notion that an individual may possess a controlled substance even though the substance is not on his person at the time of arrest. *See, e.g., United States v. Amaro,* 422 F.2d 1078, 1080 (9th Cir.1970) (constructive possession means the exercise of "dominion and control"); *Arellanes v. United States,* 302 F.2d 603, 606 (9th Cir.), *cert. denied,* 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962). We have stated that constructive possession may be demonstrated by direct or circumstantial evidence that the defendant had the power to dispose of the drug, *id.* (*citing Rodella v. United States,* 286 F.2d 306, 311, 312 (9th Cir.1960), *cert. denied,* 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199 (1961)); or "the

ability to produce the drug ...," *id.;* or that the defendant had the "exclusive control or dominion over property on which contraband narcotics are found...." *Id.* Constructive possession may also be proven by the defendant's participation in a "joint venture" to possess a controlled substance. *United States v. Valentin,* 569 F.2d 1069, 1071 (9th Cir.1978) (citing authorities). The ultimate question is whether, viewing the evidence in a light most favorable to the government, the evidence establishes a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised a dominion and control over the substance. *See, e.g., id.* (and cases cited *supra* ). *See also Murray v. United States,* 403 F.2d 694, 696 (9th Cir.1969).

We have upheld many convictions under the theory of constructive possession. In *Valentin,* 569 F.2d 1069, appellant was charged with knowingly possessing cocaine with intent to distribute. Peter Valentin, appellant's brother, delivered a package containing cocaine to an airline freight office in Los Angeles and addressed the parcel to "John Valencia" at Fairbanks, Alaska. Drug inspectors intercepted the package but sent it on to Fairbanks. Officials at Fairbanks observed appellant pick up the package signing "J. Valencia" on the receipt for it. Telephone records indicated that appellant had made several calls to his brother's residence in Redondo Beach, California, and that he and his brother had traveled to various parts of South America earlier in the year. Police followed appellant to his home, arrested him, and observed the contents of the package in plain view. On appeal, appellant argued that the government had failed to demonstrate, among other things, that he had possessed the cocaine with intent to distribute. We held that the government presented more than sufficient evidence to support the conviction. The evidence revealed that appellant and his brother had joined in a "joint venture" to obtain and distribute cocaine. We stated: "This supported the conclusion that they both shared knowing dominion and control over a large quantity of co-

caine, appellant having *constructive possession* of it at least when Peter delivered it to the air freight office in Los Angeles consigned to appellant." *Id.* at 1071 (emphasis added). *See also United States v. Morando-Alvarez,* 520 F.2d 882, 884 (9th Cir.1975); *United States v. Campbell,* 507 F.2d 955, 958 (9th Cir.1974) (both involving "joint ventures"; cited in *Valentin* ).

Similarly, in *Grayson,* 597 F.2d 1225, appellants Grayson and MacGregor were traveling companions in adjoining seats on an international flight from South America. Upon their arrival at San Francisco, customs inspectors interviewed MacGregor and found notes in his pocket indicating that drugs had been stored in the airplane bathroom. After an unsuccessful search of the bathroom, officials discovered containers of cocaine under appellants' airline seats. We held that the government had produced sufficient circumstantial evidence to prove that Grayson was in constructive possession of the cocaine. We noted that the life vests had been removed from appellants' seats and that witnesses had stated that MacGregor had made numerous trips to the bathroom during the flight. We stated: "Carrying cocaine on an international flight from Latin America, coupled with the above evidence, was sufficient to support the finding that appellants were guilty of importation, [and] possession with intent to distribute...." *Id.* at 1230. *See also United States v. Humphrey,* 759 F.2d 743, 750–51 (9th Cir.1985) (sufficient evidence to find that shipmates were in possession of large volume of marijuana).

But our cases have also carefully preserved the requirement that the government demonstrate sufficient indicia of dominion and control to support the inference of constructive possession. We have emphasized, for example, that " 'mere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or the property on which it is found, is insufficient to support a finding of possession.' " *Murray,* 403 F.2d at 696 (*quoting Arellanes,* 302 F.2d at 606). In *Arellanes,* one of our leading cases, appellants Mr. and Mrs. Arellanes,

were convicted of possession of heroin and marijuana. Police had discovered illegal drugs at appellants' home and subsequently discovered heroin and marijuana in the rear seat of appellants' automobile (which appellants were driving when the search occurred). At the time of the arrest, Mrs. Arellanes was reported to have said to a friend, "I'll bet you didn't know you were sitting on fifty pounds of weed." 302 F.2d at 605–06. The government argued that it had proven Mrs. Arellanes was in possession of the marijuana because she was constantly seen with her husband at home and travel, and because of her remark regarding the "fifty pounds of weed." We stated: "These facts might indeed be said to establish that part of the charge related to facilitation of transportation, but they cannot show the *possession* or *control* which the government must establish to raise the presumption of guilty knowledge." *Id.* at 606–07 (emphasis in original). *See also Murray,* 403 F.2d 694, 696 (evidence insufficient to prove possession by companion of person concealing narcotics on biceps).

In *Batimana,* 623 F.2d 1366, appellants Batimana and Noguera were convicted of conspiring to import and possess heroin, and possession with intent to distribute. The evidence revealed that Samuel Nicanor and Virgilio Delin had arranged to have 500 grams of heroin delivered from the Philippines to Los Angeles International Airport. Appellants accompanied Nicanor to the airport, observed the delivery of the heroin, and then followed Nicanor to a local hotel. Appellants joined Nicanor and others in a hotel room; the heroin was later delivered to the room and shortly thereafter appellants were arrested. We held that the government had presented sufficient evidence to convict appellants on the conspiracy charge. The government had demonstrated both the existence of the conspiracy and appellants' connection to it. *Id.* at 1367–68. As in the present case, however, the government did not request a *Pinkerton* instruction. We held that the government had failed to demonstrate that appellants had constructive possession of the heroin:

There is no evidence that appellants asserted dominion and control over the heroin. Indeed, the limited time span negates such an argument. Lavadia took possession of the package upon delivery. Appellants were not included in the subsequent conversation between Lavadia and Nicanor. Viewing the contents of the drug package does not indicate the requisite ability " 'to assure [its] production, without difficulty, to a customer.' " *United States v. Barnett*, 468 F.2d 1153, 1155 (9th Cir.1972).

*Id.* at 1369. *See also United States v. Ward*, 703 F.2d 1058, 1062 (11th Cir.1983) (evidence insufficient to show defendant was in possession of drugs at time of arrest).

■■■ The foregoing obviously do not cover the entire spectrum of cases involving the constructive possession doctrine. But they provide sufficient guidance to analyze the facts presented in this case. In support of its theory of constructive possession, the government points out that at the time of Porfirio Garcia's arrest at the San Diego airport, numerous calls had been made from the twelfth floor of the Metropolitan Correctional Center to the Anita and Castleman Street apartments, and that calls also had been made from these apartments to Porfirio Garcia's residence in New York. The government also points to the January 19th call from the Castleman Street apartment (which was made when Disla's passport reflected that he was out of the country), and to the name "Victor" and directions to the Newton Street apartment on the bus schedule carried by Garcia at the time of his arrest; Victor Franco lived at that apartment. The government, however, has produced no evidence as to the content of the telephone communications and no other evidence establishing Disla's connection to the cocaine seized at the San Diego airport on May 8th. Although the phone calls provide circumstantial evidence connecting Disla to the ongoing conspiracy and help support his conviction on that count, *see id.* at 1367–68, they are insufficient to support a conviction for possession of the cocaine seized at the San Diego airport on May 8, 1985. The evidence here does not approach that presented in *Valentin* and *Grayson* and is significantly less probative than that offered in *Batimana* and *Arellanes*. The facts simply do not support a reasonable inference, under *Batimana*, that Disla asserted dominion and control over the cocaine seized at the San Diego airport on May 8, 1985. We must therefore hold that Disla's conviction on Count III may not be upheld under the theory of constructive possession. *See also Ward*, 703 F.2d at 1062; *compare United States v. Kupper*, 693 F.2d 1129, 1134 (5th Cir.1982) (government demonstrated possession even though defendant was in custody where, among other things, his fingerprints were found on controlled substance).

### b. *Aiding and Abetting*

■■■ Our holding in *Batimana* also answers the government's contention that Disla's conviction on Count III may be sustained under a theory of aiding and abetting. To aid and abet another to commit a crime, the "government must show not only that the defendant participated in the criminal venture, but that he intentionally assisted the venture's illegal purpose." *United States v. Groomer*, 596 F.2d 356, 358 (9th Cir.1979); *United States v. Peichev*, 500 F.2d 917, 120 (9th Cir.), *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974). In *Batimana* (discussed *supra* ), the government pointed to appellant Noguera's presence at the hotel room where the heroin was located and his act of chaining the hotel room door after the drugs had been delivered. We held that these circumstances were insufficient to prove that the appellants had done anything to "effect the crime," or that they assisted in its perpetration. 623 F.2d at 1370. Applying the *Batimana* standard to the present case, the evidence by which Disla was found guilty as an aider and abettor was insufficient to convict him under Count III.

### D. *Motion to Sever*

Disla contends the district court erred in denying his motion to sever the wire fraud

charge (Count IV) from the other counts. The wire fraud charge arose out of Disla's alleged use of the "blue box" at the Anita Street apartment to avoid paying phone bills. Officer Nevarez had made a tape recording of a phone call made April 1, 1985 from the apartment in which a "blue box" had been used, and he had identified one of the speakers as "Cuto" (Disla's pseudonym). In his motion to sever made in advance of trial and renewed at the close of the government's case-in-chief, Disla argued he wanted to testify at his trial in defense of the drug charges in Counts I, II and III, but if he did so he would be subjected to cross-examination as to the April 1 voice recording in which the "blue box" was used.

 Whether the district court erred in denying the motion to sever is reviewed for abuse of discretion. *United States v. Nolan,* 700 F.2d 479, 482 (9th Cir.), *cert. denied,* 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). The party seeking severance bears the burden of demonstrating the need for separate trials. *United States v. Armstrong,* 621 F.2d 951, 954 (9th Cir.1980). The party bearing the burden must establish that joinder was "so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever." *Id.*

 The district court did not abuse its discretion in denying Disla's motion. The government's theory at trial was that the "blue box" was used as part of the cocaine conspiracy, and that Disla's use of the "blue box" was evidence of his participation. The evidence dealing with Disla's alleged participation in cocaine trafficking would have been relevant in a separate trial on Count IV, and hence Disla has failed to show prejudice. *See United States v. Irvine,* 756 F.2d 708, 712 (9th Cir.1985) (citing authorities). *Accord United States v. Benz,* 740 F.2d 903, 911 (11th Cir.1984), *reh'g denied en banc,* 756 F.2d 885 (11th Cir.), *cert. denied,* 106 S.Ct. 62 (1985); *United States v. Ajlouny,* 629 F.2d 830 (2d Cir.), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1980); *United States v. Scott,* 659 F.2d 585, 589 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 105 (1982).

### E. *Immunity for Porfirio Garcia*

Disla's request for compelled immunity for Porfirio Garcia is without merit. The transcript reveals no evidence of prosecutorial misconduct which would justify compelled immunity for this potential defense witness. *See United States v. Lord,* 711 F.2d 887 (9th Cir.1983); *United States v. Herman,* 589 F.2d 1191 (3rd Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).

AFFIRMED AS TO COUNTS I, II AND IV. REVERSED AS TO COUNT III.