STATE of Wisconsin, Plaintiff-Respondent,

v.

Joseph K. BRYANT, Defendant-Appellant.†

Court of Appeals

*No. 00–0686–CR. Submitted on briefs November 22, 2000.—Decided January 31, 2001.*

## 2001 WI App 41

(Also reported in 624 N.W.2d 865.)

†Petition to review denied.

◦

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne Hagopian*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Lara M. Herman*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J. A jury convicted Joseph K. Bryant of possession of a controlled substance with intent to deliver within one thousand feet of a school zone in violation of WIS. STAT. §§ 961.41(1m)(cm) and 961.49(2)(a)2.f (1999–2000).[1] Bryant presents a single issue on appeal: Whether the circuit court erred in failing to suppress statements he made in response to questions asked when the arresting detective was completing an "arrest report." We affirm given that the questioning falls under the "routine booking question" exception.

¶ 2. We will first recap the testimony significant to the single issue Bryant raises. Using evidence developed while conducting a "controlled buy" of rock cocaine from an individual residing in the lower apartment of 5712 – 19th Avenue in the city of Kenosha, the Kenosha County Controlled Substances Unit obtained a search warrant for that residence. The search warrant listed Bryant as residing at the address based upon information Detective Gregory Ollila obtained when he checked motor vehicle registration records for the license plate of a van that was seen parked outside of the residence. The van was registered in Bryant's

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

name and listed the address as his residence. Ollila participated in the execution of the search warrant, and in searching a bookcase in the living room of the residence, he found a bag of rock cocaine. When Ollila showed the bag to Bryant, who was handcuffed and sitting on the couch, Bryant stated, "[I]t's not mine, I have no idea how it got there."

¶ 3. Ollila transported Bryant to the Kenosha County Sheriff's Department and took him to the detective bureau for interrogation. Ollila testified that it was his practice to complete the department's arrest report before giving a suspect his or her *Miranda*[2] rights and beginning an interrogation. He first asked Bryant his name and Bryant replied, "Joseph Karrah Bryant." Ollila then asked Bryant his address. Bryant answered that it was the lower apartment located at 5712 – 19th Avenue and that he had just moved there from Illinois. Ollila also asked if Bryant had a record and he replied that he was on parole in Illinois for possession of heroin with intent to deliver and had not informed his parole agent of the change of address.

¶ 4. Ollila testified that sometime after he started to complete the arrest report Bryant asked for an attorney. Ollila then completed the arrest report. Rather than advise Bryant of his *Miranda* rights and attempt to interrogate him, Ollila took him to the jail within thirty minutes of their arrival at the detective bureau.

¶ 5. During the trial, the State sought to admit Ollila's testimony concerning statements Bryant made in response to questions asked to complete the arrest report. Bryant, in turn, sought to suppress the statements because he had not been given his *Miranda*

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

rights. The circuit court held that when Bryant was in the detective bureau while Ollila asked questions to complete the arrest report, Bryant was in custody and had not been given his *Miranda* rights. However, citing *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), and *State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994), the court held that Bryant's supplying of his name and address and volunteering that he had just moved from Illinois would be admissible under the routine booking question exception. The court further ordered that evidence that Bryant admitted to being on parole would be suppressed because any questions concerning his prior criminal record would be the result of interrogation.

¶ 6. While acknowledging that Wisconsin has adopted the routine booking question exception to *Miranda*, permitting law enforcement to ask suspects about biographical data, *Stevens*, 181 Wis. 2d at 433–34, Bryant asserts that it does not apply under the facts of this case. He argues that because he was charged with possession of cocaine with intent to deliver within 1000 feet of a school zone, the autobiographical questions were designed to elicit incriminating statements to establish that he had dominion and control over the rock cocaine.

¶ 7. In reviewing an order granting or denying a motion to suppress evidence, a circuit court's findings will be upheld unless clearly erroneous. WIS. STAT. § 805.17(2); *State v. Secrist*, 224 Wis. 2d 201, 207–08, 589 N.W.2d 387 (1999). However, the application of constitutional principles to the facts as found is a question of law that we decide without deference to the circuit court's decision. *State v. Amos*, 220 Wis. 2d 793, 797–98, 584 N.W.2d 170 (Ct. App. 1998).

¶ 8. In *Miranda*, the United States Supreme Court concluded that where a defendant is subject to "custodial interrogation" certain procedural safeguards must be maintained to protect the defendant's constitutional privilege against self-incrimination. *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980); *State v. Leprich*, 160 Wis. 2d 472, 476, 465 N.W.2d 844 (Ct. App. 1991). The *Miranda* Court was primarily concerned with "incommunicado [interrogation of individuals in a] police-dominated atmosphere," *Miranda v. Arizona*, 384 U.S. 436, 456 (1966), where the police actively sought to induce a defendant's confession. The Court concluded that without certain warnings concerning the defendant's constitutional rights, a defendant's statements made during police custodial interrogation are inadmissible to establish his or her guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). The *Miranda* Court reasoned that the interaction of custody and official interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. Therefore, if the police take a suspect into custody and ask him or her questions without giving *Miranda* warnings, the responses cannot be used to establish guilt. *Leprich*, 160 Wis. 2d at 476 (citing *Berkemer*, 468 U.S. at 429).

¶ 9. As noted, the United States Supreme Court directed in *Miranda* that all persons in custody must be advised of certain rights that spring from the Fifth Amendment right not to incriminate oneself. The United States Supreme Court first recognized the routine booking question exception to the admission of a statement given without *Miranda* rights in *Muniz*, 496

U.S. at 600–02. The Wisconsin Supreme Court followed suit in *Stevens*, 181 Wis. 2d at 434.

¶ 10. In *Muniz*, Justice Brennan, writing for a four-justice plurality, recognized a " 'routine booking question' exception which exempts from *Miranda*'s coverage questions [designed] to secure the 'biographical data necessary to complete booking or pretrial services.' " *Muniz*, 496 U.S. at 601 (citation omitted). The plurality specified that questions posed by the police to the defendant regarding his or her name, address, height, weight, eye color, date of birth and current age did not qualify as "custodial interrogation." *Id.* Four justices concurred on other grounds without explicitly addressing the existence of a "routine booking question" exception. *See id.* at 608 (Rehnquist, C.J., concurring) ("it is unnecessary to determine whether the questions fall within the 'routine booking question' exception to *Miranda* Justice Brennan recognizes"). Only a single justice disagreed with the plurality's recognition of the exception. *See Muniz*, 496 U.S. at 608 (Marshall, J., concurring in part and dissenting in part).

¶ 11. In *Stevens*, the Wisconsin Supreme Court acknowledged the fractured nature of *Muniz*. *Stevens*, 181 Wis. 2d at 433. Nevertheless, the supreme court adopted the routine booking question exception and held that Stevens's statements made about his name and residence at the time of his arrest and before booking were inadmissible. *Id.* at 434–35. The court limited the application of the exception to biographical questions asked "during the booking process at the police station." *Id.* at 435 n.10.

¶ 12. Neither *Muniz* nor *Stevens* provides direction on the application of the exception. Nevertheless, directions for the application of the exception can be

found in the decisions of the state and federal courts that recognized and applied the routine booking question exception before *Muniz* and *Stevens*. *See State v. Smith*, 203 N.W.2d 348, 351 (Minn. 1972) ("booking questions have value to the criminal process independent of any tendency to uncover admissions" and "police have a legitimate interest in orderly records identifying the names, addresses and places of employment of those arrested"); *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981) ("[c]ertainly not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent"); *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983) ("Ordinarily, however, the routine gathering of biographical data for booking purposes should not constitute interrogation under *Miranda*." (citation omitted)); *United States v. Doe*, 878 F.2d 1546 (1st Cir. 1989); *State v. Foster*, 562 So. 2d 808, 809 (Fla. Dist. Ct. App. 1990) ("the routine gathering of biographical data for booking purposes cannot be characterized as an inherently coercive custodial interrogation").

¶ 13. The routine booking question exception has its origin in *Innis* where the United States Supreme Court considered what sort of words or conduct on the part of law enforcement would constitute "interrogation." In *Innis*, the Court held that interrogation is either express questioning or its functional equivalent, defined to include any statements or actions that the "police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. The *Innis* Court tracked the concern expressed in *Miranda* that custodial interrogation contains a measure of psychological pressures beyond those pressures inherent in custody itself. *Innis*, 446 U.S. at 300.

■ 14. Drawing on the concerns the United States Supreme Court has expressed about "interrogation," courts recognizing the routine booking question exception theorize that not every question asked a suspect is an interrogation. *Booth*, 669 F.2d at 1237. "Many sorts of questions do not, by their very nature, involve the psychological intimidation that *Miranda* is designed to prevent." *Booth*, 669 F.2d at 1237. Thus, the routine booking question exception is limited to routine questions asked to assist in the gathering of background biographical data.[3] *Id.* at 1238.

■ 15. To qualify for the application of the exception, the questions must be asked by an agency ordinarily involved in booking suspects, must be asked during a true booking and must be asked shortly after the suspect has been taken into custody. *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983). Questions serving an administrative need may be considered routine booking questions. *Doe*, 878 F.2d at 1551. In *Muniz*, the plurality specified that questions regarding name, address, height, weight, eye color, date of birth and current age qualified as routine book-

---

[3] Contrary to Bryant's assertion that the exception only applies when a suspect is asked biographical questions when he or she is being processed for admission to a jail, the exception might apply—subject to the tests discussed in this opinion—whenever biographical information is sought. *See Franks v. State*, 486 S.E.2d 594, 597 (Ga. 1997) (the exception is confined to information required to complete an arrest report); *United States v. Booth*, 669 F.2d 1231, 1234 (9th Cir. 1981) (questioning during an investigative stop); *United States v. Disla*, 805 F.2d 1340, 1343 (9th Cir. 1986) (questioning to complete an agency form).

ing questions. *Muniz*, 496 U.S. at 601. Other courts sanction questions concerning the suspect's educational background, marital status and other information needed to complete an arrest report. *See Franks v. State*, 486 S.E.2d 594, 597 (Ga. 1997).

¶ 16. However, these questions are not accorded a blanket exception to *Miranda*. Writing for the *Muniz* plurality, Justice Brennan warned:

> As amicus United States explains, "[r]ecognizing a 'booking exception' to Miranda does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions."

*Muniz*, 496 U.S. at 602 n.14 (citations omitted). Police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained, answers to such questions are inadmissible if the suspect has not been read his or her *Miranda* rights. Even questions that usually are routine must be preceded by *Miranda* warnings if they are intended to produce answers that are incriminating. *Mata-Abundiz*, 717 F.2d at 1280.

¶ 17. The test of whether questioning constitutes interrogation and is not entitled to the routine booking question exception is if, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response. *Booth*, 669 F.2d at 1238. "The test is objec-

tive. The subjective intent of the [police officer] is relevant but not conclusive. The relationship of the question asked to the crime suspected is highly relevant." *Mata-Abundiz*, 717 F.2d at 1280 (citations omitted).

¶ 18. Using these principles to construct his argument, Bryant asserts that when Ollila asked him biographical questions while completing the arrest report, the detective intended to elicit incriminating responses that Bryant lived in the residence where the cocaine was found. The State must prove that the cocaine was found in an area that Bryant exercised dominion and control over in order to secure a conviction for possession of cocaine with intent to deliver within 1000 feet of a school zone. WIS JI—CRIMINAL 920 and 6030. Bryant contends that his admission that he lived at the residence provided the State with evidence imputing that the drugs were found in a place accessible to Bryant and subject to his "exclusive or joint dominion and control." *Schmidt v. State*, 77 Wis. 2d 370, 379, 253 N.W.2d 204 (1977).

¶ 19. Bryant relies upon *Stevens*, 181 Wis. 2d at 410, and *United States v. Disla*, 805 F.2d 1340 (9th Cir. 1986), to support his argument. However, both cases are easily distinguishable. In *Stevens*, the police submitted an affidavit in support of a search warrant for a suspected drug house that identified one of the suspected drug dealers as "Zeke." *Stevens*, 181 Wis. 2d at 434. After the police gained entry to the residence, all of the individuals were handcuffed. A police lieutenant approached Stevens and asked him if he lived there, to which Stevens responded that he did. *Id.* at 419. The lieutenant next asked Stevens his name. He at first responded, "Zeke," and then changed his answer to "Bruce Stevens." *Id.* The supreme court suppressed

Stevens's answers to the biographical questions holding first that the questions were asked during the arrest and not during booking. *Id.* at 434. The supreme court also held that Stevens's answer that his name was "Zeke" confirmed the affidavit's reference to one suspected drug dealer being named "Zeke" and identified him as the drug dealer in the affidavit. *Id.*

¶ 20. In contrast to *Stevens*, in this case the police submitted an affidavit in support of a search warrant that identified Bryant as residing at 5712 – 19th Avenue, the address of the suspected drug house. The police obtained this information two days prior to executing the search warrant by checking the registration for a vehicle parked in front of the residence when they conducted a controlled buy. Also in contrast to *Stevens*, although Bryant was handcuffed in the residence during the execution of the search warrant, he was not asked any biographical questions at the residence or when he was arrested after discovery of the cocaine. Finally, in contrast to *Stevens*, Bryant was asked biographical questions in the station house, a location the majority in *Stevens* approved as the locale to ask biographical questions. *Id.* at 435 n.10.

¶ 21. *Disla* is also of no help to Bryant. The police in *Disla* were executing a search warrant for an illegal electronic device in an apartment when they discovered a quantity of cocaine and related material including Disla's passport and alien registration card that listed the address as his residence. *Disla*, 805 F.2d at 1342–43. Disla was not present when the search warrant was executed. However, while the police were still at the apartment, Disla drove up, parked on the street and started to walk toward the apartment. The arresting officer testified that when he made eye contact with Disla, Disla turned and started to walk away.

At that time, the officer arrested Disla. *Id.* at 1343. Disla was handcuffed and taken into the apartment; before being advised of his *Miranda* rights, Disla was asked to complete a form on which he admitted to residing in the apartment. *Id.* Based on these facts, the Ninth Circuit held that the routine booking question exception did not apply and suppressed Disla's admissions on the form.

> The facts here indicate that [the officer] should have known that the question regarding Disla's residence was reasonably likely to elicit an incriminating response. [The officer] knew that a large quantity of cocaine and cash had been found at the apartment and that the resident(s) of the apartment had not been identified. After the cocaine and cash were discovered, [the officer] asked neighbors for a description of the persons who lived at the apartment and observed Disla and his brother approach the apartment building. [The officer] arrested Disla, asked him several investigative questions, and then requested that Disla answer the name, age, residence, and employment status questions from the [form]. The questioning here did not arise in a routine "booking" setting. Further, the question as to where Disla lived was related to an element (possession) of the crime that [the officer] had reason to suspect Disla committed. In light of both the context of the questioning and the content of the question, we must conclude that Disla was subjected to interrogation.

*Id.* at 1347 (citations omitted).

¶ 22. In contrast to *Disla*, in this case the police had identified Bryant as a resident of the apartment at 5712 – 19th Avenue before applying for a search warrant. Further, in contrast to *Disla*, the biographical

questioning of Bryant occurred at the police department and not at the scene of the arrest.

¶ 23. Having distinguished the two cases that Bryant contends support his proposition that the routine booking question exception does not apply to the biographical questions asked when the arrest report was being completed, we will now apply the tests that we have previously set forth. Bryant does not dispute that the Kenosha sheriff's department is an agency that is involved in booking suspects, that the questions were asked during a true booking or that the questions were asked shortly after he was taken into custody. We are left to consider if, in light of all the circumstances, Ollila should have known that the question of where Bryant resided was reasonably likely to elicit an incriminating response. *Booth*, 669 F.2d at 1238.

¶ 24. The facts here confirm that when Ollila asked Bryant the biographical questions at the detective bureau, he was not engaged in "interrogation." Nothing in the record supports a conclusion that the question about Bryant's residence was intended to elicit an incriminating response. Several days before the search warrant was executed, Ollila observed a controlled drug buy take place at 5712 – 19th Avenue. Ollila observed a car parked in front of that address at the time of the controlled buy and when he checked the vehicle's registration he found out that it was registered to Bryant at the 5712 – 19th Avenue address. Although Bryant's residence is relevant to the charge of possession with intent to deliver, Ollila's knowledge that Bryant was residing at 5712 – 19th Avenue when he applied for the search warrant greatly diminishes the relevancy of Bryant's admission of residing at that address. Unlike the officer in *Disla* who wanted to determine the identity of the apartment residents, here

Ollila already had sufficient evidence connecting Bryant to the residence.

■

¶ 25. We conclude that the circuit court properly applied the routine booking question exception to the biographical questions asked of Bryant and properly admitted his responses into evidence. Therefore, we affirm.

*By the Court.*—Judgment affirmed.