Sᴛᴀᴛᴇ of Wisconsin, Plaintiff-Respondent,

v.

Curtis E. Gᴀʟʟɪᴏɴ, Defendant-Appellant.†

Court of Appeals

*No. 01–0051–CR. Submitted on briefs October 5, 2001.—Decided October 10, 2002.*

2002 WI App 265

(Also reported in 654 N.W.2d 446.)

---

† Petition to review granted 2-19-03.

---

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Howard B. Eisenberg*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Eileen W. Pray*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Vergeront, P.J., Dykman and Lundsten, JJ.

¶ 1. LUNDSTEN, J. Curtis Gallion appeals a judgment convicting him of homicide by use of a motor vehicle with a prohibited alcohol concentration in violation of WIS. STAT. § 940.09(1)(b) (1997–98).[1] Gallion entered a guilty plea and was sentenced under truth-in-sentencing to twenty-one years of incarceration followed by nine years of extended supervision. Gallion asserts the sentencing court committed three errors: (1) the court violated Gallion's rights to procedural due process and equal protection of the law when it failed to provide adequate reasons for the specific sentence imposed under truth-in-sentencing; (2) the court considered two improper factors: the victim's good character and the contrast between Gallion's character and the character of his victim; and (3) the court imposed a sentence that is "too harsh" considering Gallion's age, history, and crime. We affirm on all issues.

## *Background*

¶ 2. At about 1:30 a.m. on March 3, 2000, nineteen-year-old Curtis Gallion was drunk and was driving his car at a high rate of speed westbound on West Locust Street in Milwaukee. At the intersection of West Locust and 35th Street, Gallion ran a red light and broadsided another car traveling through the intersection on 35th Street. A reconstruction of the collision indicated that Gallion's car was traveling between forty-five and fifty-four miles per hour and made no attempt to slow or stop before impact. The collision caused extensive passenger-side damage to the car struck by Gallion's car. Vanessa Brown was in the front passenger seat of the other car, and the collision killed her.

---

[1] All other references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 3. Police officers were on the scene almost immediately. They found Gallion lying across the front seat of his car. Gallion's breath smelled strongly of alcohol, and a blood test within three hours of the collision showed his blood alcohol content was .237.

¶ 4. Gallion agreed to plead guilty to homicide by intoxicated use of a motor vehicle. Pursuant to the plea agreement, the district attorney recommended prison, but did not recommend any particular amount of incarceration. Following a lengthy sentencing hearing and extended comments by the sentencing court on Gallion's history, character, and the harm caused by his crime, the court sentenced Gallion under truth-in-sentencing to thirty years: twenty-one years in prison and nine years on extended supervision. On December 4, 2000, Gallion asked the sentencing court to modify his sentence, alleging an erroneous exercise of discretion. The court denied the motion.

### *Discussion*

*Whether Constitutional Considerations Require a New Approach to Sentencing Under Truth-in-Sentencing*

¶ 5. Gallion argues that his rights to procedural due process and equal protection of the law were violated when the sentencing court failed to provide reasons for the specific sentence imposed. Gallion states he has a constitutional right to have the court explain why it imposed twenty-one years of incarceration rather than a shorter or longer period of incarceration, such as ten, fifteen, twenty, or twenty-five years. Gallion contends the reasons given by the sentencing court here were inadequate because they were general enough to support "virtually any sentence."

¶ 6. We are unsure whether Gallion is asserting that the requirements imposed on sentencing courts have long been constitutionally deficient. However, he clearly argues that, under truth-in-sentencing, it is constitutionally required that sentencing courts justify with great specificity the reason for the particular sentence imposed. Gallion speculates that Wisconsin appellate courts have consistently affirmed harsh sentences prior to truth-in-sentencing—sentences imposed without the sort of detailed explanation he demands—because appellate courts knew the "parole board was there to ameliorate sentence disparity or excessive sentences." He asserts that more demanding requirements must be imposed under truth-in-sentencing because now, "[i]f the judge says 21 years of confinement, the defendant will serve every day of that period unless the Governor (or death) commutes the sentence." This greater finality and certainty, Gallion reasons, requires that a sentencing court explain with specificity the reason behind the particular amount of time it chooses to impose.

¶ 7. The State acknowledges that truth-in-sentencing confers on sentencing courts significantly greater control over sentence length and thereby confers increased sentencing discretion, but the State argues there is no indication that the legislature intended to rein in judicial discretion. More to the point, the State contends, and we agree, that Gallion has failed to demonstrate that the existing rules governing sentencing discretion are unconstitutional when applied to sentences imposed under truth-in-sentencing.

¶ 8. Gallion acknowledges that cases such as *McCleary v. State*, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971), and *State v. Stubbendick*, 110 Wis. 2d 693, 699, 329 N.W.2d 399 (1983), already require sentencing

courts to state reasons for imposing a particular sentence. Nonetheless, he contends that with the advent of truth-in-sentencing, the bar must be raised. Gallion does not, however, support this claim with persuasive legal authority or reasoned argument.

¶ 9. In support of his contention that, under truth-in-sentencing, procedural due process requires a more detailed sentencing rationale, Gallion relies on two federal cases, *United States ex rel. Scott v. Illinois Parole and Pardon Board*, 669 F.2d 1185 (7th Cir. 1982), *overruled on other grounds, Heidelberg v. Illinois Prisoner Review Board*, 163 F.3d 1025 (7th Cir. 1998), and *Parker v. Corrothers*, 750 F.2d 653 (8th Cir. 1984), for the proposition that a "decision maker must explain in more than boilerplate generalities why it concludes that the seriousness of the offense requires the deprivation of freedom." However, Wisconsin law already requires more than "boilerplate generalities." As stated long ago in *McCleary*, 49 Wis. 2d at 277:

> [T]here must be evidence that discretion was in fact exercised. Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a logical rationale founded upon proper legal standards. As we pointed out in *State v. Hutnik* (1968), 39 Wis. 2d 754, 764, 159 N.W.2d 733, " . . . there should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth."

Moreover, Gallion asserts that more specificity is required but does not articulate a new workable standard. How does a sentencing court explain why it is imposing twenty rather than fifteen years? We suspect Gallion has not offered a standard because the task is impos-

sible. Sentencing decisions are not amenable to the sort of precise explanation Gallion seeks.

¶ 10. Gallion's combined due process and equal protection argument is similarly unavailing. Relying on *Bush v. Gore*, 531 U.S. 98 (2000), Gallion states: "Due Process and Equal Protection of Law under the Fourteenth Amendment to the United States Constitution require the adoption of 'specific standards' so that all persons are dealt with fairly and equally." Gallion asserts: "If 'specific standards' are required—as a matter of Due Process and Equal Protection—when counting ballots, *a priori* such standards should be applied to the deprivation of the most basic of human right—liberty." *Bush*, however, provides no support for Gallion's position. The determination of voter intent based on "marks or holes or scratches on an inanimate object, a piece of cardboard or paper," *id*. at 106, is a far cry from individualized sentencing. As the *Bush* Court explained, the "formulation of uniform rules to determine intent based on these recurring circumstances is practicable." *Id*. Individualized sentencing is much different; whatever the number of variables involved in ascertaining voter intent based on a cardboard or paper ballot, that number pales in comparison with the vast number of variables involved in sentencing.

¶ 11. Gallion asserts that some form of sentencing guidelines are "constitutionally required." He contends a constitutional sentence cannot be imposed if the sentencing court has no comparative "information on sentencing and incarceration practices." Gallion states that without comparative information, "sentencing in Wisconsin has become arbitrary and violative of Due Process and Equal Protection of Law."

¶ 12. We do not quarrel with the proposition that comparative data or sentencing guidelines provide help-

482

ful information to sentencing courts. But the question here is whether such information is constitutionally mandated. In this respect, Gallion has not provided anything approaching a convincing legal analysis. For example, although Gallion asserts that comparative information was constitutionally required before truth-in-sentencing, he does not provide any authority for that remarkable proposition. Also, Gallion's argument that comparative information is required under truth-in-sentencing is limited to the following: "This problem is all the more serious now that 'truth in sentencing' has come to the State." Because Gallion does not present a developed legal argument that comparative sentencing information is constitutionally required, we address this claim no further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues inadequately briefed.").

██

¶ 13. Nor are we persuaded by Gallion's contention that new sentencing standards must be imposed because there is no parole under truth-in-sentencing. Gallion asserts that the Wisconsin Parole Board reduces sentence disparity and ameliorates excessive sentences for non-truth-in-sentencing sentences. This may be true, but this court has no way of knowing the extent to which it is true. In any event, with or without parole, differences in imposed sentences have a dramatic effect on defendants. Finally, Gallion's elimination-of-parole argument contains the same flaw as his other related arguments: he has not articulated a new workable standard to replace the one he claims is inadequate.

¶ 14. Accordingly, Gallion has failed to show that truth-in-sentencing requires new rules governing sentencing discretion. He has not only failed to show that a court must now explain why it imposed a specific

sentence instead of other possible sentences within the applicable sentencing range, he has also failed to explain how this feat could be achieved.

### *Whether the Sentencing Court Considered Improper Factors*

¶ 15. In two closely related arguments, Gallion contends the sentencing court considered improper factors. First, Gallion contends the sentencing court improperly considered the victim's good character. In this respect, Gallion argues both that the court placed too much emphasis on the victim's character and that the court should not have considered the victim's character at all because Gallion did not intend to harm the victim. Second, Gallion contends the sentencing court improperly increased his sentence because his character was poor when compared with the victim's character. We reject both propositions. We conclude the sentencing court was entitled to consider the victim's good character in the context of assessing the harm caused by Gallion's crime. Further, assuming, without deciding, that a sentencing court may not consider the victim's character as an isolated sentencing factor and may not increase a sentence because of an unfavorable comparison between a defendant's and a victim's character, we conclude the sentencing court did neither in this case.

¶ 16. An improper sentencing factor is a factor that is "totally irrelevant or immaterial to the type of decision to be made." *Elias v. State*, 93 Wis. 2d 278, 282, 286 N.W.2d 559 (1980). We find no Wisconsin decision directly addressing whether a homicide victim's charac-

ter, standing alone, is a proper sentencing factor.[2] However, the authority we do find supports the view that a victim's character may be considered as part of one of the three primary sentencing factors: gravity of the offense.

¶ 17. The gravity of an offense encompasses harm caused by the offense. *See State v. Carter*, 208 Wis. 2d 142, 156, 560 N.W.2d 256 (1997) (gravity includes effect of crime on victim). The harm caused by a homicide encompasses the loss suffered by surviving family and friends. This view is in keeping with our state's victim

---

[2] *State v. Spears*, 220 Wis. 2d 720, 585 N.W.2d 161 (Ct. App. 1998) (*Spears I*), and *State v. Spears*, 227 Wis. 2d 495, 596 N.W.2d 375 (1999) (*Spears II*), involve victim character information presented at sentencing, but neither address the general question of the propriety of victim character information. In *Spears I*, this court assumed that there was no error when the prosecutor put on evidence of the victim's good character, *Spears*, 220 Wis. 2d at 725–26, but this court did not need to decide the issue. Rather, the question presented in *Spears I* was the propriety of the sentencing court considering the victim's criminal record as a counter-point to good character testimony from the victim's family. *Id.* at 726–28. In *Spears II*, the supreme court affirmed the admission of the victim's criminal record, but on the narrow ground that the character evidence was relevant to the seriousness of the crime itself. The supreme court said:

> Because we hold that a defendant has the right to present evidence supporting her view of the crime, we decline to address the defendant's additional arguments that the victim's criminal record was relevant to rebut "good" character evidence with evidence of the victim's "bad" character and that the record was relevant to the three sentencing factors that a circuit court must consider when making its sentencing determination.

*Spears*, 227 Wis. 2d at 499 n.1.

rights legislation. Crime victims have the right "[t]o have the court provided with information pertaining to the economic, physical and psychological effect of the crime upon the victim and have the information considered by the court." WIS. STAT. § 950.04(1v)(pm); *see also State v. Voss*, 205 Wis. 2d 586, 595–96, 556 N.W.2d 433 (Ct. App. 1996). Victim impact statements are authorized by WIS. STAT. § 972.14(3)(a). The logical corollary to these rights is that prosecutors, and surviving family and friends of homicide victims, may inform sentencing courts of a victim's character, including his or her traits and activities, in order to convey the loss caused by the homicide. A sentencing court, in turn, may consider this information. Taking this case as an example, it is impossible to convey the loss suffered by Vanessa Brown's family members, friends, employer, and the community generally without commenting on Brown's fine character. It is precisely because of her outstanding character that the loss is so great.

¶ 18. Gallion argues: "A defendant does not deserve more or less time in prison because of the character of the person he killed when driving while drunk." Gallion asserts that a criminal sentence should not be affected by whether the offender "killed a homeless person with a long rap sheet . . . or . . . the most productive and important member of the community." However, even assuming, without deciding, that victim character alone is not relevant at sentencing, such an assumption does not mean that sentencing courts may not consider the effect of a homicide on the victim's family and friends. We observe that in *State v. Spears*, 227 Wis. 2d 495, 596 N.W.2d 375 (1999), Chief Justice Abrahamson's dissent quotes the following from the circuit court's decision, with apparent approval:

"The court should ... not attempt to measure the relative value of the victim's life. While the defendant may benefit when no one appears to mourn the deceased, there is no corresponding right to argue that 'since nobody else cares, why should we' or to otherwise seek to diminish the value of the victim's life.

"*Even though there might be circumstances in which the court could weigh the positive contributions and worth of the victim in assessing the harm caused by the crime,* it does not follow that there is a right to have the court consider that a victim was a terrible burden on society."

*Id.* at 516 (Abrahamson, C.J., dissenting) (emphasis added).[3]

---

[3] We note that the United States Supreme Court has held that evidence of the impact of a victim's death on the victim's family is admissible at a capital sentencing hearing. *Payne v. Tennessee,* 501 U.S. 808, 823–26 (1991). In *Payne,* the Court acknowledged that in prior cases it had expressed concern that "the admission of victim impact evidence permits a [capital sentencing] jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823. Nonetheless, the Court approved the admission of such victim impact evidence, stating:

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

*Id.*; *see United States v. McVeigh,* 153 F.3d 1166, 1216–17 (10th Cir. 1998) (impact of murder on victim's family relevant to determination of whether death penalty should be imposed).

¶ 19. Gallion argues that the character of a victim, even as that character bears on the loss suffered by friends and family, is irrelevant where, as here, a defendant does not intend to harm the particular victim. We disagree. It is well established in criminal law that severe sentencing consequences often flow from unintended results. For example, regardless of intent, far different consequences flow from a conviction for simply operating a vehicle with a prohibited alcohol concentration and a conviction for homicide by use of a vehicle with a prohibited alcohol concentration. *See Booth v. Maryland*, 482 U.S. 496, 519 (1987) (Scalia, J., dissenting) ("If a bank robber aims his gun at a guard, pulls the trigger, and kills his target, he may be put to death. If the gun unexpectedly misfires, he may not. His moral guilt in both cases is identical, but his responsibility in the former is greater."), *overruled on other grounds, Payne v. Tennessee*, 501 U.S. 808 (1991).

¶ 20. We conclude that a sentencing court may consider the effect of a homicide on the victim's family and friends, and that such consideration may include the character traits of the victim. Our review of the sentencing transcript leads us to conclude that that is what occurred here. For example, the court explained:

> You killed an innocent woman. A good woman. A good mother, a good daughter, a good friend. You extinguished her life, and you have forever affected the life of her three-year-old son and all of her family members . . . .
>
> You have [inflicted] so much hurt on so many people. You have affected so many lives.

Accordingly, we are satisfied that the sentencing court

considered Vanessa Brown's character in the context of assessing crime severity and did not punish Gallion simply because Brown was an extraordinary person.

¶ 21. In a closely related argument, Gallion asserts that the sentencing court improperly increased his sentence based on a comparison of his character with that of his victim, Vanessa Brown. Gallion notes that four people attended his sentencing hearing to speak about Brown: her mother, her father, an employer, and a teacher. The court also received eight written letters from Brown's friends and relatives. Both speakers and writers described Vanessa Brown as a warm, caring friend and mother, who was dedicated to her job and was full of potential. Gallion points to comments made by the sentencing court which compare Gallion with Brown.[4] Gallion asserts that these comments

---

[4] The sentencing court observed:

This is a case that involves two very, very different people, Curtis Gallion and Vanessa Brown, who were exact opposites.

Curtis Gallion and Vanessa Brown lived in the same community but they really lived in different worlds. We have Curtis Gallion who came from a family that wasn't as warm and loving as Vanessa Brown's. We have a man, Curtis Gallion, who was educationally limited. And on the other hand, Vanessa Brown, who worked and struggled to get her education, to get her diploma with honors and to go beyond . . . high school.

We have Curtis Gallion who as a younger man was involved in a lot of criminal activity. And on the other hand, Vanessa Brown who lived a crime free, exemplary life. Two very opposite people who unfortunately cross paths and came together on March 3rd, 2000, which brings everyone who is here into this courtroom.

The court also noted:

[W]ho really is Curtis Gallion? . . . Curtis Gallion is a 19–year-old man. A young, young man who educationally is limited. Read

489

reflect the improper consideration of the relative value of his character and the character of his victim. He relies on the same dissent we have referred to above, Chief Justice Abrahamson's dissent in *Spears*, 227 Wis. 2d 495. There, the Chief Justice expressed concern about the "improper balancing of the 'comparative worth' of the defendant and the victim." *Id.* at 515–16. While we share the Chief Justice's concern, we conclude that the sentencing record does not show that "improper balancing" occurred in this case.

¶ 22. Sentencing courts are required to consider the character of offenders. *State v. Sarabia*, 118 Wis. 2d 655, 673, 348 N.W.2d 527 (1984). And, as we have held in this decision, a sentencing court in a homicide case may consider the character of a victim in the context of assessing the gravity of the offense. We conclude it is unreasonable to permit sentencing courts to consider a defendant's character and the character of a homicide victim, and then also require that the court not notice and not comment on the difference between the two. Prohibiting such observation and comment would impose a semantic trap for sentencing courts with no corresponding benefit to defendants.

¶ 23. In the case before us, the sentencing court never said it was imposing more time because of the *contrast* between Gallion and Brown. Rather, Gallion asks this court to infer reliance on the contrast from comments made by the sentencing court about the contrast. However, it is self-evident that sentencing courts do not increase or decrease sentences based on every observation they make. In the absence of some

about the problems you had in school, the problems you caused in school. So educationally your life was the opposite of Vanessa Brown.

490

clear indication that the sentencing court imposed additional incarceration time because of the *contrast* in character between Gallion and Brown, we will not infer as much, especially where, as here, it was proper for the court to consider the character of both people.

¶ 24. Sentencing courts are "presumed to have acted reasonably," and the defendant has the burden of showing that the "sentence was based on clearly irrelevant or improper factors." *See State v. Wickstrom*, 118 Wis. 2d 339, 354–55, 348 N.W.2d 183 (Ct. App. 1984); *State v. Haskins*, 139 Wis. 2d 257, 268, 407 N.W.2d 309 (Ct. App. 1987). Gallion has shown that the sentencing court commented on the contrast between his character and that of Vanessa Brown, but he has not met his burden of showing that the court imposed a more harsh sentence *because* of that contrast.

*Whether Gallion's Sentence Shocks Public Sentiment*

¶ 25. In a single paragraph, Gallion presents the alternative argument that his sentence was "too harsh, with or without consideration of Ms. Brown's character." Gallion notes that he was nineteen years old at the time of the crime and that, in the preceding five years, he had only two adjudications: one juvenile and one adult misdemeanor. Gallion states his serious drug and alcohol abuse problem is at the root of his misconduct. He concludes: "This sort of background in a person so young does not warrant locking him up for the next 21 years." However, Gallion's brief minimizes the severity of his conduct prior to this offense. When we look at Gallion's history, his current offense, and the range of potential incarceration time, and apply the well-

established standard of review applicable to sentencing decisions, we cannot agree that Gallion is entitled to. resentencing.

¶ 26. The principles governing sentencing discretion are well established. Sentencing courts have been given "great discretion." *State v. Jackson*, 110 Wis. 2d 548, 552, 329 N.W.2d 182 (1983). Sentencing decisions are generally accorded "a strong presumption of reasonableness because the circuit court is best suited to consider the relevant factors and assess the defendant's demeanor." *State v. Setagord*, 211 Wis. 2d 397, 418, 565 N.W.2d 506 (1997). "We may not substitute our preference for a sentence merely because, had we been in the trial court's position, we would have meted out a different sentence." *State v. Spears*, 147 Wis. 2d 429, 446, 433 N.W.2d 595 (Ct. App. 1988). A sentencing court must consider three primary sentencing factors: "(1) the gravity of the offense, (2) the character and rehabilitative needs of the offender, and (3) the need for protection of the public." *Sarabia*, 118 Wis. 2d at 673. The weight to be given each factor is within the sentencing court's discretion. *Wickstrom*, 118 Wis. 2d at 355.

¶ 27. Sentencing courts are "presumed to have acted reasonably, and the defendant can only rebut the presumption by showing an unreasonable or unjustifiable basis for the sentence in the record." *Id.* at 354. A sentencing court "misuses its discretion when it fails to state the relevant and material factors that influenced its decision, relies on immaterial factors, or gives too much weight to one factor in the face of other contravening factors." *State v. Steele*, 2001 WI App 160, ¶ 10, 246 Wis. 2d 744, 632 N.W.2d 112. In addition:

[A] trial court exceeds its discretion as to the length of the sentence only when the sentence is "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances."

*Id.* (quoting *State v. Thompson*, 172 Wis. 2d 257, 264, 493 N.W.2d 729 (Ct. App. 1992)).

¶ 28. When the sentencing court fails to set forth the reasons for the sentence imposed, "we are obliged to search the record to determine whether in the exercise of proper discretion the sentence imposed can be sustained." *McCleary*, 49 Wis. 2d at ·282. Therefore, "it is . . . our duty to affirm the sentence on appeal if from the facts of record [the sentence] is sustainable as a proper discretionary act." *Id.*

¶ 29. Gallion does not assert that the sentencing court failed to exercise discretion or that the court failed to consider appropriate sentencing factors, including aggravating and mitigating factors in his background. Rather, his assertion that his sentence is "too harsh" amounts to an assertion that his sentence was " 'so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.' " *Thompson*, 172 Wis. 2d at 264 (quoting *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975)) . Under this highly deferential standard, Gallion's claim fails.

¶ 30. The legislature has classified homicide by use of a motor vehicle with a prohibited alcohol concentration as a Class B felony carrying a maximum term of incarceration of forty years followed by a possible twenty years of extended supervision. WIS. STAT.

§§ 940.09(1)(b), 973.01(2), and 939.50(3)(b). Thus, Gallion's twenty-one years of incarceration and nine years of extended supervision are about half that authorized by the legislature.

¶ 31. There is no dispute that Gallion's crime called for a lengthy term of incarceration. Gallion's own counsel suggested something in "a range of five to 10" years of incarceration followed by "10 years or so" of extended supervision. The presentence report recommended thirteen to sixteen years of incarceration.

¶ 32. We cannot say that proper sentencing considerations do not support a sentence in the middle range of that authorized by the legislature. This is not a case where the offender has no criminal history and where the offender caused the collision by failing to respond appropriately to an unexpected situation. At the same time, Gallion does not present the worst case scenario. For example, he has not previously injured or killed people while driving drunk. Rather, Gallion's situation presents something in the middle ground.

¶ 33. Gallion's appellate brief is factually wrong when it asserts he had "two adjudications—one juvenile and one adult—for carrying a concealed weapon." In fact, Gallion had three juvenile adjudications in addition to his adult conviction. From the age of fourteen until the time of the homicide in this case, Gallion was almost continually in trouble and in and out of group homes and secure detention.

¶ 34. When Gallion was fourteen, he was apprehended in possession of 1.58 grams of crack cocaine and 36.7 grams of marijuana. The car he was riding in at the time he was apprehended had an assault rifle in the trunk. Gallion was adjudicated delinquent based on one count of possession with intent to deliver cocaine and one count of possession with intent to deliver mari-

juana. The juvenile court imposed one year of "intensive probation," but Gallion failed to cooperate with rules and treatment.

¶ 35. Seven months after his first arrest, Gallion was again arrested for possession of cocaine with intent to deliver. Gallion had twenty-eight "individually wrapped corner cuts" of crack cocaine with a total weight of 1.65 grams. He was adjudicated delinquent on this charge and given one year probation, with placement in a group home. Gallion again failed to cooperate and absconded. In November of 1995, three months after turning fifteen, Gallion was committed to Ethan Allan for one year.

¶ 36. In 1997, after having been back in the community for about fifteen months, Gallion was arrested for carrying a concealed weapon, a handgun. Gallion said he was carrying the gun for protection and, when arrested, was pursuing a person who had robbed him. In August of 1997, just prior to his seventeenth birthday, Gallion was again committed to Ethan Allen, this time for nine months.

¶ 37. In February of 1998, Gallion left Ethan Allen and was placed in a group home, where he remained until May of 1998. In December of 1998, when Gallion was eighteen years old, he was again arrested for carrying a concealed weapon and in July of 1999 was convicted of that charge as an adult. Gallion said he was carrying the gun for protection. He received a six-month jail sentence. We find no place in the record indicating when Gallion was actually released from jail, but if he served his full six-month jail sentence, the drunk driving homicide offense in this case occurred about three months after his release.

¶ 38. At the time of sentencing, Gallion had a one-year-old son with his girlfriend, who was pregnant

with their second child. A psychological report prepared for the defense revealed a history of drug and alcohol abuse in Gallion's family. Gallion began drinking alcohol at age fourteen and has used marijuana in the past. Gallion was diagnosed with a cognitive disability at age thirteen, and scored in the mildly retarded range.

¶ 39. As the sentencing court observed, Gallion failed to avail himself of opportunities to deal with his drug and alcohol problems. At the time of the collision, Gallion's blood alcohol content was almost two and a half times the legal limit. Gallion drove with reckless abandon, oblivious to or disregarding traffic signals. Moreover, his crime deprived a child of his mother, deprived devoted parents of their child, and deprived family and friends alike of an exceptional young woman with a bright future.

¶ 40. We also observe that the sentencing court hoped to send a message to potential drunk drivers, even if the audience might be small. The court's message was: Don't drive drunk or you might end up in prison for a long, long time. Plainly, the legislature had deterrence in mind when it authorized forty years of incarceration for this crime, and we will not second guess the sentencing court's deterrence rationale.

¶ 41. Considering all of the circumstances, we affirm the sentence imposed because it was not " 'so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances.' " *Thompson*, 172 Wis. 2d at 264 (quoting *Ocanas*, 70 Wis. 2d at 185).

*By the Court.*—Judgment and order affirmed.

¶ 42. DYKMAN, J. (*concurring*). I concur in the

majority mandate because I agree that constitutional considerations do not require a new approach to sentencing under truth-in-sentencing, and I agree that the sentencing court did not consider improper factors when sentencing Gallion. I also agree that Gallion's sentence does not shock public sentiment.

¶ 43. But removing the parole board from the sentencing equation raises other issues which we do not address today. Using common law principles, courts have for many years maintained the right to alter imposed sentences, albeit within restrictive boundaries. Truth-in-sentencing has not, and perhaps could not prevent courts from correcting what they subsequently conclude was error. We will have to address those issues when they arise.