STATE of Wisconsin, Plaintiff-Respondent,

v.

Antoine Leshawn DOUGLAS, Defendant-Appellant.

Court of Appeals

*No. 2012AP1275–CR. Submitted on briefs February 26, 2013.
—Decided March 19, 2013.*

2013 WI App 52

(Also reported in 830 N.W.2d 126.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Teirney S. Christenson* of *Gass Weber Mullins LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Christine A. Remington*, assistant attorney general.

Before Fine, Kessler, Brennan, JJ.

¶ 1. FINE, J. Antoine Leshawn Douglas appeals the judgment entered on his guilty pleas convicting him of: (1) unlawfully possessing a firearm as a previously convicted felon, *see* Wis. Stat. § 941.29(2)(a); (2) unlawfully possessing an electric weapon, *see* Wis. Stat. § 941.295(1) (2009–2010); and (3) unlawfully possessing tetrahydrocannabinols, *see* Wis. Stat. § 961.41(3g)(e).[1] This appeal concerns only Douglas's sentence and the weapons crimes. He claims that the search warrant that allowed the police to find the gun was the unlawful fruit of what he contends was his interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Rhode Island v. Innis*, 446 U.S. 291 (1980).[2] He also argues that the trial court erroneously exercised its sentencing discretion. We affirm.

---

[1] The judgment is dated July 12, 2011. Douglas's notice of appeal purports to appeal a "judgment and order entered on July 8, 2011," which was the date the trial court sentenced Douglas. We ignore this error. *See* Wis. Stat. Rule 805.18(1) ("The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party.") (made applicable to appellate proceedings by Wis. Stat. Rule 809.84).

Wisconsin Stat. § 941.295(1) was renumbered sub. (1m) by 2011 Wis. Act 35.

[2] A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. Wis. Stat. § 971.31(10).

**I.**

¶ 2. Police officer Daniel Robinson and his partner arrested Douglas on February 23, 2011, when they found him with marijuana in a parked van whose engine was running. The officers had arrested Douglas two weeks earlier on another marijuana charge. Douglas does not challenge the lawfulness of his arrest.

¶ 3. The officers handcuffed Douglas and put him in the back of their police car. Ultimately, Officer Robinson returned to the police car to get what he called "basic information" from Douglas in order to fill out the required "arrest and detention report." Neither Robinson nor his partner gave Douglas *Miranda* warnings. Robinson explained that this was because he "wasn't intending to talk to him about the criminal action, I was just gathering preliminary information for the initial booking report." Douglas, however, told Robinson that he had a gun that he could get for the police. Douglas claims that this incriminating statement, which led to the search warrant and the weapons, was in response to Robinson's "interrogation" or its "functional equivalent," and, therefore, the trial court erred in refusing to suppress the weapon evidence. *See State v. Knapp*, 2005 WI 127, ¶ 73, 285 Wis. 2d 86, 123, 700 N.W.2d 899, 918 ("[T]he exclusionary rule bars physical fruits obtained from a deliberate *Miranda* violation.") (applying Article I, § 8 of the Wisconsin Constitution).

¶ 4. Both Robinson and Douglas testified at the evidentiary hearing on Douglas's motion to suppress.

¶ 5. Although the prosecutor walked Robinson through his conversation with Douglas, Robinson's most cogent explanation of his recollection of that conversation was in response to questions asked by

Douglas's lawyer and by the trial court. First, Douglas's lawyer's cross-examination of Robinson:

Q .... Now, after he was handcuffed and put in the back of the squad car, what did you do exactly?

A I believe I recovered the marijuana and collected vehicle information, then I went to the [police] car and started to speak with Mr. Douglas to get his correct information; spelling of his name, date of birth, address, Social Security number, things of that nature that I need to fill out the arrest and detention report.

....

Q Now, after you gathered that initial information about him, such as his name, date of birth, address, isn't it correct that you asked him what information he had that would help him out?

A He solicited me and asked if he could do something to get out of trouble, and I might have asked him what he had or what he could do. And when we talked about the marijuana, I declined working with him, because he had offered similar information two weeks prior, and that was the end of the conversation as far as I was concerned.

Q I guess what I'm asking is do you recall asking him that question?

A I don't recall asking him that specific question, no.

THE COURT: What do you mean by "that question"? Which question are we talking about?

[Defense lawyer]: What information Mr. Douglas had that would help him out.

THE COURT: So you didn't ask him that question?

413

THE WITNESS: Not that I recall, no.

The defense lawyer then referred to Robinson's "supplemental report," which the officer said he read before he testified at the hearing: "[I]n it you said you had asked Douglas what information he had that would help him out, correct?" Officer Robinson agreed that the report "does state that." The defense lawyer then continued:

> Q Okay. And isn't it correct that it was after that question he had told you about the firearms?

> A It was; but before he brought anything up about the firearms, I told him I wasn't interested in it and that he should contact his attorney prior to doing anything.

On re-direct examination, Robinson pointed out that Robinson's question to Douglas about helpful information came after "Douglas again stated that he wanted to work[,]" and that this was what the report indicated.

> Q Okay. So it was the defendant that told you prior to you asking that question that he wanted to work, is that correct?

> A Yes.

> . . . .

> Q . . . [W]hich came first, that question: I asked Douglas what information he had to help him out, or the defendant's offer to work or provide information?

> A The defendant asked if he could work.

> Q And had he also made that same offer when you had arrested him on February 7th, 2011?

> A Yes.

414

Q And what did you tell him on this date?

A I declined working with him.

Q And on this date prior to him talking to you about the gun, what is it you — what is the statement that you made to him immediately prior to him talking to you about the gun?

A I told him that I didn't want the information, that if he wanted to work he should go through his attorney.

Q And did you say anything else to him immediately after—after—after that, prior to him telling you about this firearm in his house?

A No.

¶ 6. The trial court also focused on Officer Robinson's recollection of his conversation with Douglas:

THE COURT: All right. Just so I get this straight, you're talking to the defendant. He says he wants to work. Your response to him is what? I know you don't know specifically words you used, but what do you think you said to him?

THE WITNESS: It would be generally what information he had.

THE COURT: Did you tell him you just wanted general information?

THE WITNESS: Yes.

THE COURT: And then in response he said to you what?

THE WITNESS: He offered information about marijuana dealers, and I declined the information.

. . . .

415

THE COURT: Then what did he say after that?

THE WITNESS: There was a pause, I was doing reports, and then he offered up information about having somebody bring his gun to me.

THE COURT: So he said — he brought it up, what about having someone bring his firearm to you?

THE WITNESS: Yeah. He said — I believe he said he could have someone bring the gun to me and that I could arrest the person with the gun.

¶ 7. As noted, Douglas also testified. He told the trial court that once Robinson returned to the police car:

> He said, you got two open cases with us already and — you got two open cases. I said, yeah, I know that. He like, well, what you — what can you do to—to do something, whatever, you got somebody [*sic*] house you can set up, weed house, or you got some information for us? I'm like no, I ain't got no information for you, but I have a gun for you.

In response to the trial court's questions, Douglas reiterated that his offer to Robinson was in response to the officer's questions.

¶ 8. In denying Douglas's motion to suppress the weapons evidence, the trial court found "Officer Robinson's testimony to be credible" and that Douglas "initiated a conversation in which he stated to the officer that he wanted to work." Significantly, the trial court also found that after Robinson had declined Douglas's marijuana-dealers offer, "there was a pause, and the defendant re-initiated the conversation around — said, what about having someone bring a firearm from his house to Officer Robinson and then Officer Robinson could arrest the person with the gun." The

416

trial court determined that after Robinson shut down Douglas's offer to help get marijuana dealers, and after the "pause," Douglas changed the subject and then volunteered the information that supported the search warrant. Thus, the trial court concluded that Douglas's comments about the gun were not in response to either interrogation or its functional equivalent.

¶ 9. As we have seen, Douglas pled guilty to unlawfully possessing a firearm, unlawfully possessing an electric weapon, and unlawfully possessing tetrahydrocannabinols. Apparently as a result of a plea bargain, five counts of felony bail-jumping were dismissed but specifically "read-in" for sentencing purposes. Further, as the trial court noted, Douglas's two other marijuana cases were also dismissed and read-in for sentencing. Each of the felony bail-jumping charges carried a potential penalty of six years' imprisonment and a $10,000 fine. *See* Wis. Stat. §§ 946.49(1)(b) & 939.50(3)(h). Douglas specifically acknowledged at the plea hearing that the trial court would consider the bail-jumping charges and the two other marijuana cases in assessing an appropriate sentence. As part of the agreement with the defense, the State recommended a total sentence of nine and one-half years of initial confinement followed by five years of extended supervision. The State's recommendation therefore was for the maximum initial-confinement penalties for the crimes to which Douglas pled guilty.

¶ 10. The trial court imposed the following sentences: two years of initial confinement followed by two years of extended supervision on the gun conviction; one year of initial confinement followed by one year of extended supervision on the electric weapon conviction; and one year of initial confinement followed by one year of extended supervision on the tetrahydro-

cannabinols conviction. It made all the sentences consecutive for a total of four years of initial confinement followed by four years of extended supervision.

¶ 11. In passing sentence, the trial court opined that Douglas's conduct was "serious" and that he had a history of "continual [criminal] conduct to the point of where [when] you are out of custody, it continues to happen." This was based on the State's uncontradicted assertion at the hearing that Douglas had "a 1997 delivery of a controlled substance," a 1997 "possession of [a] stolen vehicle," and "a 2005 drug conspiracy," all from Illinois. The State also noted, again without contradiction, that Douglas had a "six-year sentence in Illinois, it says he was released on November 28, 2007, I guess discharged in 2009 from parole, and then [in] 2010 immediately picks up these cases."

¶ 12. The trial court noted that Douglas was a good father but that this was tempered by the fact that "good dads also think about their kids before they do things[,]" and that Douglas should have stopped his criminality "the first time [he] got caught[.]" The trial court also acknowledged that Douglas's criminal history was not "the worst record in the world," but that his putting marijuana "out into the community" and his continuing criminality had to be stopped by putting him "into custody."

> As far as amount of time, I do not think that the amount recommended by the [s]tate is necessary here. I think it's a lot of time. But I do think some time is necessary, Mr. Douglas, for you to get this message home. And hopefully when you get out you will be thinking about this differently so this does not happen again.

Douglas claims that this was an erroneous exercise of sentencing discretion.

## II.

*A. Alleged Miranda violation.*

¶ 13. We apply two standards of review in determining whether the trial court erred in refusing to suppress the weapon evidence. We uphold the trial court's "findings of evidentiary or historical fact unless they are clearly erroneous." *See State v. Hambly*, 2008 WI 10, ¶ 49, 307 Wis. 2d 98, 126, 745 N.W.2d 48, 62. Based on the Record here, the trial court's credibility determination and its findings of fact in line with the officer's testimony are thus invulnerable. *See State v. Jacobs*, 2012 WI App 104, ¶ 17, 344 Wis. 2d 142, 154–155, 822 N.W.2d 885, 890–891. We decide *de novo* the legal issue of whether those findings require suppression. *See Hambly*, 2008 WI 10, ¶ 49, 307 Wis. 2d at 126, 745 N.W.2d at 62.

¶ 14. As is well-known, *Miranda* decreed that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless" the person in custody is first "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. The trial court and the parties also recognize that "custodial interrogation" encompasses questions or comments that "police should know are reasonably likely to elicit an incriminating response from the suspect" even though those questions or comments may not appear to do so directly:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to

419

either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Innis*, 446 U.S. at 300–301 (footnotes omitted).

¶ 15. *Innis* concerned the shotgun murder of a taxi driver. Id., 446 U.S. at 293. Police arrested Thomas J. Innis and gave him the required *Miranda* warnings. *Innis*, 446 U.S. at 294. Innis said he wanted a lawyer. *Ibid.* As two officers drove Innis to the police station, the officers discussed the threat that the shotgun, which had not yet been found, might pose to students attending a nearby school for the handicapped, noting " 'there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.' " Id., 446 U.S. at 294–295. Innis led them to the shotgun. Id., 446 U.S. at 295. *Innis* held that the officers' conversation among themselves was neither "interrogation" nor its "functional equivalent." Id., 446 U.S. at 302. First, the officers did not ask Innis questions about the shotgun. *Ibid.* (The officers' "conversation was, at least in form, nothing more than a dialogue between the two

officers to which no response from the respondent was invited."). Second, the officers' conversation was not the "functional equivalent" of interrogation because:

> It cannot be said, in short, that [the officers] should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children. Nor is there anything in the record to suggest that the police knew that the respondent was unusually disoriented or upset at the time of his arrest.

Id., 446 U.S. at 302–303. *A fortiori,* the same is true here.

¶ 16.　First, other than following up on Douglas's question concerning his possible help in getting marijuana dealers, the only questions Officer Robinson asked were routine booking questions, and those questions may be asked irrespective of whether the officer gives *Miranda* warnings to the person in custody from whom the booking information is sought, or whether the person has invoked his or her right to silence or to have the help of a lawyer. *State v. Bryant,* 2001 WI App 41, ¶¶ 14–15, 241 Wis. 2d 554, 563–564, 624 N.W.2d 865, 869–870.

¶ 17.　Second, *Miranda* does not require suppression of voluntary statements made by a person in custody unless, as we have seen, those statements are elicited by the functional equivalent of interrogation. *Miranda,* 384 U.S. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental im-

port of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."); *Innis*, 446 U.S. at 300–301. Significantly, as the trial court recognized, the only question that Robinson asked Douglas was in response to Douglas's offer to help get marijuana dealers, and that question had nothing to do with guns. Thus, assuming without deciding that any further responses by Douglas in connection with the dealing of marijuana would have to be suppressed if offered at any trial on a marijuana charge to prove, for example, "knowledge," *see* Wis. Stat. Rule 904.04(2), Douglas's change-of-subject offer to get a gun for Robinson was volunteered after what the trial court found was a "pause" and while Robinson was continuing to fill out the required paperwork. This is what starkly distinguishes this case from *State v. Martin*, 2012 WI 96, 343 Wis. 2d 278, 816 N.W.2d 270, upon which Douglas relies.

¶ 18. In *Martin*, an officer arrested Randy L. Martin, whom the officer saw brandish what appeared to be a weapon, after he got out of a car he was driving, to confront another driver. *Id.*, 2012 WI 96, ¶¶ 4–5, 343 Wis. 2d at 286–287, 816 N.W.2d at 274–275. Another officer searched Martin's car and discovered a gun near a passenger, whom *Martin* describes as "a close childhood friend of Martin's[.]" *Id.*, 2012 WI 96, ¶ 8, 343 Wis. 2d at 287–288, 816 N.W.2d at 275. The officer asked both Martin and his passenger who owned the gun. *Id.*, 2012 WI 96, ¶ 10, 343 Wis. 2d at 288–289, 816 N.W.2d at 276. Both denied ownership. *Ibid.* As the officers were preparing to arrest Martin's friend, Martin asked "whether they would let [the friend] go if he (Martin) admitted the revolver belonged to him." *Id.*, 2012 WI 96, ¶¶ 10–11, 343 Wis. 2d at 289, 816 N.W.2d

at 276 (parenthesis in *Martin*). In response, the officer "told Martin that he did not want Martin to say it was his revolver if it was not, but he should be a 'stand-up guy' and admit the revolver was his if it was." *Id.*, 2012 WI 96, ¶ 11, 343 Wis. 2d at 289, 816 N.W.2d at 276. Martin said the gun was his and that they should let his friend go. *Ibid.* This custodial questioning violated *Miranda. Martin*, 2012 WI 96, ¶ 41, 343 Wis. 2d at 305, 816 N.W.2d at 284. As we have seen, Douglas's case is wholly different.

¶ 19. In sum, on our *de novo* review, we agree with the trial court that Douglas's get-the-gun offer was freely volunteered and was not the result of either *Miranda* interrogation or its functional equivalent.

## B. Sentencing.

■■■■■

¶ 20. A sentencing court has broad sentencing discretion and may give the various sentencing factors the weight it deems appropriate. *See State v. Steele*, 2001 WI App 160, ¶ 10, 246 Wis. 2d 744, 750, 632 N.W.2d 112, 116. The trial court's sentencing remarks here showed that it relied, as it must, on the three primary factors material to a rational sentence: (1) the seriousness of the crime; (2) the defendant's character; and (3) the need to protect the public. *See McCleary v. State*, 49 Wis. 2d 263, 274, 182 N.W.2d 512, 518 (1971); *see also State v. Gallion*, 2004 WI 42, ¶¶ 59–62, 270 Wis. 2d 535, 565–566, 678 N.W.2d 197, 211. Although Douglas contends that the consecutive sentences were, in essence, too harsh, a trial court may craft an appropriate sentence by recognizing that concurrent sentences may unduly undermine appropriate sentencing goals by giving a defendant a pass for some

of his or her crimes. Thus, "whether to impose consecutive, as opposed to concurrent, sentences is, like all other sentencing decisions, committed to the trial court's discretion." *State v. Johnson*, 178 Wis. 2d 42, 52, 503 N.W.2d 575, 578 (Ct. App. 1993).

¶ 21. Douglas also faults the trial court for not, as expressed in his main brief on this appeal, giving "any rational and explainable basis for the consecutive sentences imposed for weapons-based crimes, instead focusing on the defendant's history with marijuana and his need for treatment." But that is not an accurate representation of the trial court's expressed rationale; it specifically noted that Douglas deliberately had a gun even though he "clearly had to have known that [he] can't have a firearm based on [his] prior cases" and a letter that he got from Illinois telling him that he could not possess any weapons. The weapon matters were all part of what the trial court noted was Douglas's continuing criminality, a criminality that had to be stopped by a significant period of incarceration followed by in-community supervision.

> Although we recognize that trial courts should impose " 'the minimum amount of custody' " consistent with the appropriate sentencing factors, *State v. Hall*, 2002 WI App 108, ¶ 8, 255 Wis. 2d 662, 671, 648 N.W.2d 41, 45 (quoted source omitted), "minimum" does not mean "exiguously minimal," that is, insufficient to accomplish the goals of the criminal justice system— each sentence must navigate the fine line between what is clearly too much time behind bars and what may not be enough. Without an elaborate system of sentencing grids, like there is in the federal system, no appellate-court-imposed tuner can ever modulate with exacting precision the exercise of sentencing discretion. *See*

*Gallion*, 2002 WI App 265 at ¶ 9, 258 Wis. 2d at 481–482, 654 N.W.2d at 450.

*State v. Ramuta*, 2003 WI App 80, ¶ 25, 261 Wis. 2d 784, 799–800, 661 N.W.2d 483, 490 (parenthesis in *Ramuta*). While the trial court did not specifically assess each crime to which Douglas pled guilty as if it were the only crime to be considered at sentencing, its sentencing analysis fully considered the appropriate sentencing factors for all of Douglas's admitted crimes. It also gave Douglas a significant break by not only not following the State's sentencing recommendation, but also by permitting the State to dismiss the five felony bail-jumping charges and the two other marijuana cases. *See State v. Conger*, 2010 WI 56, ¶ 24, 325 Wis. 2d 664, 684–686, 797 N.W.2d 341, 351–352. ("[W]hether to reject a plea agreement is squarely within the court's authority."); *State v. Kenyon*, 85 Wis. 2d 36, 45, 270 N.W.2d 160, 164 (1978) ("Prosecutorial discretion to terminate a pending prosecution in Wisconsin is subject to the independent authority of the trial court to grant or refuse a motion to dismiss 'in the public interest.' "). Douglas's appellate complaint that the trial court erroneously exercised is discretion is without merit.

*By the Court.*—Judgment affirmed.