**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 31, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.   2022AP1373-CR**
**2022AP1374-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos.  2021CM318
2021CM617

**IN COURT OF APPEALS**
**DISTRICT IV**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KALE K. KEDING,

DEFENDANT-APPELLANT.

APPEAL from judgments of the circuit court for Wood County: NICHOLAS J. BRAZEAU, JR., Judge. *Judgment affirmed; judgment reversed and cause remanded for further proceedings.*

¶1      GRAHAM, J.[1]   Kale Keding appeals judgments of conviction that were entered by the circuit court following Keding's no-contest pleas in two

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version.

misdemeanor cases that have been consolidated for purposes of appeal: a judgment of conviction for possessing a controlled substance (Wood County case No. 2021CM318, the "possession case"); and a judgment of conviction for bail jumping (Wood County case No. 2021CM617, the "bail jumping case"). On appeal, Keding challenges the order in the possession case that denied his motion to suppress statements he made at the police station after his arrest for possessing a controlled substance.

¶2 For reasons explained in greater detail below, I conclude that the circuit court erred when it denied Keding's motion to suppress the statements he made at the police station. The State has not attempted to prove that the error was harmless, and I accept the State's silence on this point as a concession that it was not. I therefore reverse the judgment in case No. 2021CM318.

¶3 Turning to the bail jumping case, Keding does not explain how his challenge to an order in the possession case could result in reversal of his conviction for bail jumping, nor does he make any other argument about the propriety of the judgment in that case. I therefore affirm the judgment in case No. 2021CM617.

## BACKGROUND

¶4 Following a traffic stop, Keding was arrested for possession of a controlled substance. The State filed case No. 2021CM318, which charged him with possession of cocaine contrary to WIS. STAT. § 961.41(3g)(c). Keding moved to suppress the inculpatory statements he made at two different points during his arrest and booking: certain statements he made to Officer Libby Abel at the scene of the arrest; and other statements he made to Officer Mack Scheppler at the police station as he was being booked. Abel and Scheppler both testified during the hearing on the motion to suppress, and body camera footage capturing the

2

interactions between Keding and the officers was introduced into evidence. The following summary of undisputed facts is derived from the testimony and exhibits presented at the hearing and is consistent with the circuit court's findings of fact.

¶5      At approximately 4:00 a.m. on May 30, 2021, Abel initiated a traffic stop of a vehicle with a nonfunctioning brake light. Keding was one of the vehicle's three occupants, and was sitting in the back seat.

¶6      For reasons that are not material to this appeal, Abel called for backup and a K9 unit, and the police dog alerted to the presence of a controlled substance in the vehicle. Officers asked the three occupants to step out of the vehicle and patted them down for weapons. During a search of the vehicle, officers located a small bag containing a substance that officers believed to be cocaine in the front passenger-side door.[2] All three of the vehicle's occupants denied ownership of the bag, and they likewise denied knowledge of its contents. Abel stated that she would be charging all three occupants with possession of a controlled substance, and that each was free to call for a ride.

¶7      Shortly thereafter, the driver told Abel that he had witnessed Keding using what he believed to be cocaine earlier that night, and he speculated that the bag found in the vehicle might belong to Keding. Following that statement, Abel approached Keding as he waited for his ride and resumed questioning him. Keding made a series of inculpatory statements, including that he had struggled with substance abuse in the past, that he had "snorted an Adderall" earlier that evening, and that his nose was runny as a result. Abel told Keding that she was placing him

---

[2] Keding does not challenge the legality of the traffic stop, nor does he challenge the search of the vehicle.

under arrest, and she told the driver and the other passenger that they would not be charged.

¶8      Abel then transported Keding to the police station. While Keding was waiting in the booking area, Abel performed a preliminary test on the substance that had been found in the vehicle, and the results indicated that the substance was cocaine.

¶9      Abel returned to the booking area and initiated an exchange with Keding. During the exchange, Abel stated that she wanted to ask him additional questions and had to give him *Miranda* warnings;[3] however, before Abel could give those warnings, Keding indicated that he wanted an attorney:

> Abel:  So, I would like to ask you more questions okay, but because you're in custody, I'd have to read you your *Miranda* rights, okay?  Do you think you'd be willing to answer questions or are you thinking no already?
>
> Keding:  Um, seeing as how I got arrested, I'm going to need a lawyer.  So.
>
> Abel:  Okay.  Okay.  So, you're wishing to remain silent?
>
> Keding:  I don't want to but I guess I'm going to have to.

¶10     Abel responded in the affirmative and ceased all questioning.  As a result of the above-described exchange, Keding was not given *Miranda* warnings at any time during the booking procedure.  Most pertinent here, he was not advised

---

[3] *See **Miranda v. Arizona**, 384 U.S. 436 (1966).  The now-familiar "*Miranda* warnings" inform the suspect that they have the right to remain silent; that anything they say can be used against them in a court of law; that they have the right to the presence of an attorney; and that if they cannot afford an attorney, one will be appointed prior to questioning if they so desire. *Id.* at 479.

that he had the right to remain silent, and that anything he said could be used against him in a court of law. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

¶11 Moments later, Scheppler observed Keding throw an item into a trash can. Scheppler, who was aware that Keding had not been given *Miranda* warnings and had invoked his right to counsel and his right to remain silent, initiated the following exchange:

> Scheppler: What did you toss in there?
>
> Keding: A Kleenex. It might have some residue for you.
>
> Scheppler: Alright. [chuckles]

¶12 Forty seconds passed. Based on the video footage, it appears that Scheppler left the booking area for at least a portion of that 40-second period while Keding mused about the crime lab's procedures for testing controlled substances. Scheppler then returned to the booking area and engaged Keding in the following exchange:

> Scheppler: So, you were saying some residue might be on the Kleenex or what?
>
> Keding: In the snot. There's going to be a little cocaine in there.
>
> Scheppler: Some cocaine?
>
> Keding: Yeah, I did some at the bar. I forgot about it because I like had drinks and like drinking impairs your—so that's all I'm going to give you.

¶13 Scheppler was asked about these exchanges at the suppression hearing, and he testified as follows. When he asked what Keding had discarded, his question was not for the "purpose[] of gathering evidence," and Scheppler did not "believe [he] was asking anything related to the offense[.]" Scheppler did not expect that Keding's response would be about "residue," and he was surprised by that

response.  Regarding the follow-up questions about the residue, Scheppler testified that he "repeated some of the statements that [Keding] made," and that he did so because he was "curious" what Keding meant "when he said residue" and "what the Kleenex might have tested for."  At that point, Scheppler was "just trying to have a conversation" with Keding "about the cocaine."

¶14   As noted, the State charged Keding with possession of cocaine (case No. 2021CM318), and he was released on bail.  Keding was later arrested for violating the conditions of his bail, and the State issued a complaint (case No. 2021CM617) that charged him with misdemeanor bail jumping.

¶15   Meanwhile, in the possession case, Keding filed a motion to suppress, which challenged the admission of the inculpatory statements Keding made to Abel at the scene of the arrest.  The State conceded that the statements should be suppressed, and the circuit court granted that portion of Keding's motion.  I therefore discuss Keding's statements to Abel no further.

¶16   Keding's motion to suppress also challenged the admission of the statements Keding made to Scheppler at the police station regarding the tissue Keding had thrown away.  Keding argued that Scheppler's questioning constituted interrogation, and that he was interrogated without receiving *Miranda* warnings and after he unequivocally invoked his right to counsel.  He argued that the statements should be suppressed because their introduction at trial would violate the Fifth Amendment to the United States Constitution.

¶17   The circuit court denied Keding's motion with respect to those statements.  The court determined that Keding had not been given *Miranda* warnings, that he had unequivocally invoked his right to counsel, and that all further interrogation had to cease.  However, the court concluded that Scheppler's

questioning did not constitute interrogation. It determined that the inquiry about what Keding had thrown in the trash was "reasonable," and that Keding's statement in response was "voluntary" and "not elicited by the questioning of the officer." It also determined that Scheppler's follow-up inquiries merely confirmed Keding's "weird" response. Accordingly, the court declined to suppress the statements Keding made to Scheppler at the police station.

¶18 Seven days later, Keding entered a plea agreement with the State. Pursuant to the agreement, the State amended the charge of possession of cocaine to possession of a controlled substance contrary to WIS. STAT. § 961.41(3g)(b), and Keding pled no contest to the amended charge in the possession case and the charge in the bail jumping case. Pursuant to a joint sentencing recommendation, the circuit court withheld sentence and imposed one year of probation in both cases.

## DISCUSSION

¶19 Keding appeals both judgments of conviction. In his appellate briefing, Keding challenges the circuit court's denial in the possession case of his motion to suppress the inculpatory statements he made to Scheppler.[4] However, he does not explain how his challenge to that order could result in reversal of his conviction for bail jumping, nor does he make any other argument related to the bail jumping case.

¶20 Accordingly, in the discussion that follows, I confine my analysis to the possession case. I first consider whether the introduction of Keding's statements

---

[4] "Ordinarily, a guilty plea waives all non-jurisdictional defects and defenses." *State v. Conner*, 2012 WI App 105, ¶15, 344 Wis. 2d 233, 821 N.W.2d 267 (quoting *State v. Hampton*, 2010 WI App 169, ¶23, 330 Wis. 2d 531, 793 N.W.2d 901). "However, 'a narrowly crafted exception to the rule exists,' 'which permits appellate review of an order denying a motion to suppress evidence, notwithstanding a guilty plea.'" *Id.*; WIS. STAT. § 971.31(10).

at trial would violate the Fifth Amendment.  After concluding that it would, I address the harmless error doctrine.

## I.

¶21    I review the denial of a motion to suppress evidence under a two-part standard of review.  *State v. Conner*, 2012 WI App 105, ¶15, 344 Wis. 2d 233, 821 N.W.2d 627.  I uphold a circuit court's findings of fact unless they are clearly erroneous, and I review do novo whether those facts warrant suppression.  *Id.*

¶22    The Fifth Amendment to the United States Constitution and Article I, § 8 of the Wisconsin Constitution guarantee a privilege against compelled self-incrimination.[5]  *See* U.S. CONST. amend V; WIS. CONST. art. I, § 8.  This privilege "protects individuals not only from legal compulsion to testify in the courtroom[,] but also from informal compulsion exerted by law[ ]enforcement during in-custody questioning."  *State v. Harris*, 2017 WI 31, ¶11, 374 Wis. 2d 271, 892 N.W.2d 663 (citation omitted).  To secure the privilege against compelled self-incrimation, a suspect has the right to remain silent while in police custody, and also the right to have an attorney present during questioning.  *Miranda*, 384 U.S. at 444, 467-69.  In addition, the State may not introduce at trial any statements by a suspect stemming from a custodial interrogation unless law enforcement used procedural safeguards sufficient to temper the inherently coercive elements of custodial interrogation.  *Id.* at 444.  These safeguards include the requirement that, prior to questioning, law enforcement give the suspect a set of prophylactic warnings regarding the right to

---

[5] The United States Supreme Court has determined that the Fifth Amendment privilege against self-incrimination must be observed in state court proceedings.  *State v. Cunningham*, 144 Wis. 2d 272, 276, 423 N.W.2d 862 (1988) (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)).  And our supreme court has interpreted the privilege against self-incrimination in the Wisconsin Constitution to provide the same protections as the Fifth Amendment.  *See State v. Ward*, 2009 WI 60, ¶55, 318 Wis. 2d 301, 767 N.W.2d 236.

remain silent and to have an attorney present; and the requirement that the State conduct itself accordingly depending on whether and how the suspect elects to invoke or waive those rights. *Id.* at 444-45, 467-75; *Harris*, 374 Wis. 2d 271, ¶13.

¶23 Here, Keding argues that his statements to Scheppler were taken in violation of these safeguards and must be suppressed on two different grounds. First, Keding contends that he was interrogated by Scheppler while he was in custody, and without having been given *Miranda* warnings. If true, the lack of *Miranda* warnings provides one ground for precluding the State from introducing his statements at trial. *See Miranda*, 384 U.S. at 444; *see also State v. Martin*, 2012 WI 96, ¶41, 343 Wis. 2d 278, 816 N.W.2d 270 (statements should be suppressed based on the failure to give *Miranda* warnings if the suspect was in custody, was subjected to interrogation, and was not given *Miranda* warnings). Second, Keding contends that the custodial interrogation occurred after he invoked his right to counsel, that he did not reinitiate contact with law enforcement after he invoked that right, and that he did not waive his right to counsel prior to answering Scheppler's questions. If true, this is a second and independent ground for precluding the State from introducing his statements at trial. *See Conner*, 344 Wis. 2d 233, ¶16 (suppression warranted based on the failure to honor invocation of right to counsel if the suspect was in custody, unequivocally invoked the right to counsel, was subjected to further interrogation by law enforcement, did not reinitiate those subsequent discussions, and did not knowingly, intelligently, and voluntarily waive the right to counsel).

¶24 Under either means of framing the issue on appeal, suppression is warranted only if Scheppler's questioning of Keding constitutes "interrogation," as that term has been defined for Fifth Amendment purposes. And here, to the extent that Scheppler's questioning constitutes "interrogation," the first ground is

9

dispositive, because it is undisputed that Keding was in custody and had not received *Miranda* warnings at the time Scheppler questioned him. *See Martin*, 343 Wis. 2d 278, ¶41 (*Miranda* warnings required if suspect is subjected to custodial interrogation). I therefore confine my analysis to the first ground, and I proceed to assess whether Scheppler's questioning constituted interrogation.

¶25 The term "interrogation" encompasses "express questioning" of a suspect, as well as its "functional equivalent."[6] *See State v. Cunningham*, 144 Wis. 2d 272, 278-79 423 N.W.2d 862 (1988) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980)). My analysis focuses primarily on whether Scheppler's inquiries to Keding fall within the definition of express questioning.

¶26 *Miranda* broadly defined interrogation to mean any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 467. However, our supreme court has stated that "express questioning" does not actually encompass "every inquiry directed to [a] suspect" who is in custody. *Harris*, 374 Wis. 2d. 271, ¶16 (internal citation omitted).

---

[6] The functional equivalent of express questioning includes "any words or actions on the part of the police, other than those normally attendant to arrest and custody," that are reasonably likely to elicit an incriminating response," or, in other words, "that could reasonably have had the force of a question upon the suspect." The test can be stated as follows:

> if an objective observer (with the same knowledge of the suspect as the police officer) could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response, that is, could reasonably have had the force of a question on the suspect, then the conduct or words would constitute interrogation.

*Cunningham*, 144 Wis. 2d at 278-79 (summarizing the test from *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980)).

¶27     According to ***Harris***, the determination turns on "the nature of the information the question is trying to reach." ***Id.***, ¶17 (citing ***Doe v. United States***, 487 U.S. 201, 211 n.10 (1988)).  A question constitutes "express questioning" and is therefore "interrogation" if the question is "reasonably likely to elicit an incriminating response." ***State v. Bryant***, 2001 WI App 41, ¶13, 241 Wis. 2d 554, 624 N.W.2d 865; ***Martin***, 343 Wis. 2d 278, ¶36 (citing ***Pennsylvania v. Muniz***, 496 U.S. 582, 589 (1990) (representing the opinion of the court)); ***State v. Armstrong***, 223 Wis. 2d 331, 355-57, 588 N.W.2d 606 (1999), *overruled on other grounds by* ***State v. Halverson***, 2021 WI 7, ¶¶21, 28, 395 Wis. 2d 385, 953 N.W.2d 847.

¶28     Notably, the concept of an "incriminating response" is not limited to those responses that are "inculpatory." *See* ***Cunningham***, 144 Wis. 2d at 279. Instead, an incriminating response encompasses "*any response*—'whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial.'" ***Id.*** at 279 (quoting ***Innis***, 446 U.S. at 301, n.5) (emphasis altered).[7]  It would appear that virtually any question that calls for a testimonial response is reasonably likely to elicit an incriminating response. *See* ***Harris***, 364 Wis. 2d 271, ¶16 (appearing to equate incriminating responses with those that are "testimonial," and defining a testimonial response as "a communication—written, oral or otherwise—upon which reliance is to be placed as involving [the suspect's] consciousness of the facts and the operations of his mind in expressing it." (citation omitted)).  By contrast, if the

---

[7] *See also* ***Miranda***, 384 U.S. at 476-77 (stating that "[t]he privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner," without "distinguish[ing] degrees of incrimination," and observing that statements intended by a defendant to be exculpatory are often used to impeach the defendant's trial testimony and prove guilt by implication); ***Pennsylvania v. Muniz***, 496 U.S. 582, 594-95 (1990) (representing the opinion of the court) (The privilege is implicated when a suspect is required "to disclose *any knowledge they might have*" or speak their guilt; it is the "extortion of information from the accused; the attempt to force [them] to disclose the contents of [their] own mind, that implicates the [privilege]." (citation omitted) (emphasis added)).

information sought by a question has "no potential to incriminate the suspect," the question does not amount to interrogation. *Harris*, 374 Wis. 2d 271, ¶¶6, 16-17 (the detective's question "would you like to give me a statement" was not express questioning because it sought nothing more than a yes or no answer that would lack any testimonial significance and could not be potentially incriminating); *State v. Kramar*, 149 Wis. 2d 767, 778, 789-90, 440 N.W.2d 317 (1989) (an officer's conversation with a suspect about the suspect's schoolwork and parents was "small talk" and did not amount to interrogation); *State v. Badker*, 2001 WI App 27, ¶¶6, 16, 240 Wis. 2d 460, 623 N.W.2d 142 (asking whether an arrested suspect was alright and whether he required medical assistance in response to his moans was not reasonably likely to elicit an incriminating response).

¶29    Here, as stated above, Scheppler asked Keding three questions after he observed Keding throw something into the trash:  (1) "What did you toss in there?"; (2) "So, you were saying some residue might be on the Kleenex or what?"; and (3) "Some cocaine?"  Of these questions, the most challenging to address—and the closest call—is the first question.

¶30    It cannot be disputed that Scheppler's first question was a direct question that sought a factual response.  Keding asserts that Scheppler's question was investigatory in nature and that the factual response elicited by the question was likely to be incriminating.  As I understand it, Keding appears to be arguing that Scheppler's question was investigatory because it sought information from Keding about what he had just discarded, and in turn, what he had just possessed, and that information has potential evidentiary value in a prosecution for possession of a controlled substance.  *See Bryant*, 241 Wis. 2d 554, ¶17 ("The relationship of the question asked to the crime suspected is highly relevant." (citation omitted)).  The question called for Keding to reveal his "consciousness of [] facts" about an item

12

that had been in his possession, ***Harris***, 374 Wis. 2d 271, ¶16, and it was reasonably likely that the State might seek to introduce those facts at trial.

¶31     The State does not directly address this argument.  It instead argues that Scheppler's question was not interrogation because "it was reasonable and neutral," the question was related to "the booking procedure," and the question was not likely to elicit the incriminating response that Keding gave—that the tissue he threw out might have "residue" on it.  I understand the State to be arguing that Keding's statement about residue should not be suppressed because it was in response to a question that would be routinely asked during the booking process, or perhaps because Keding's statement was volunteered and nonresponsive to the question Scheppler asked.  I address each argument in turn.

¶32     The State's first argument implicates the "routine booking question exception."  That exception has its origin in language from ***Innis***, 446 U.S. at 292, 301, which suggests that words and actions "normally attendant to arrest and custody" do not constitute interrogation.  The exception was endorsed by a plurality of justices in ***Muniz***, 496 U.S. at 601 (representing the opinion of a four-justice plurality of the United States Supreme Court), and it was adopted by our supreme court in ***State v. Stevens***, 181 Wis. 2d 410, 433-34, 511 N.W.2d 591 (1994), *overruled on other grounds by* ***Richards v. Wisconsin***, 520 U.S. 385 (1997).  Under this exception, routine booking questions that are designed to secure "biographical data necessary to complete booking or pretrial services," and that are asked during a true booking at the police station shortly after a suspect has been taken into custody, do not require ***Miranda*** warnings, so long as the questions are not reasonably likely to elicit an incriminating response.  *See* ***Bryant***, 241 Wis. 2d 554, ¶15 (creating the test for the routine booking question exception).  Wisconsin courts have limited the exception to questions that seek biographical data, such as a

13

suspect's name, address, height, weight, eye color, date of birth, and age. *Id.*, ¶15; *Stevens*, 181 Wis. 2d at 433. Here, Scheppler's question about what Keding had thrown away did not seek any information that was biographical, and therefore, it does not fit within this exception.

¶33 The State argues that officers routinely ask questions about a suspect's possessions during the booking process, and that such questions are important for promoting officer safety and inventorying the possessions of persons who have been arrested. That may be the case, but the fact that officers routinely ask a certain type of question during booking does not mean that such questions fall within the routine booking question exception, as that exception has been defined by Wisconsin courts. Nor does the State point to any case that recognizes an exception for questions that promote officer safety or serve inventory-related purposes. Although the *Bryant* court observed that "[q]uestions serving an administrative need may be considered routine booking questions[,]" *Bryant*, 241 Wis. 2d 554, ¶15 (citing *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1998)), it did not purport to create a new exception for questions that do not fall within the routine booking question exception, nor did it purport to expand the routine booking question exception beyond those questions that seek biographical data. *Id.*, ¶¶14-15.[8]

---

[8] Neither *Miranda* nor the privilege against self-incrimination prevent police from searching a person who has been arrested during booking for purposes of inventorying their property. The constitutionality of such searches is governed by the Fourth Amendment. *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983) ("it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect").

Nor does the Fifth Amendment prohibit law enforcement from asking questions that promote officer safety. Indeed, the privilege against self-incrimination does not prevent an officer from asking any question at all—the privilege only prohibits the State from compelling a defendant such as Keding to be a witness against himself by using his unwarned statements stemming from custodial interrogation at trial.

¶34  I now turn to the circuit court's determination that Keding's statement was "voluntary." Some cases recognize that "volunteered" statements need not be suppressed based on law enforcement's failure to give *Miranda* warnings, and other cases have extended that concept to statements that are elicited by questioning, yet are wholly nonresponsive to the question that was posed. *See* WAYNE R. LAFAVE, 2 CRIM. PROC. § 6.7(d) (4th ed.); *see also United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836-38 (8th Cir. 2014) (a suspect's statement concerning a gun was "volunteered" because it was nonresponsive to the officer's question about the suspect's immigration status); *United States v. Jones*, 600 F.3d 847, 854-55 (7th Cir. 2010) (incriminating statements by a suspect to a detective, made after the suspect repeatedly requested to speak to the detective, were volunteered and not the product of interrogation); *State v. Douglas*, 2013 WI App 52, ¶17, 347 Wis. 2d 407, 830 N.W.2d 126 (declining to suppress an incriminating statement about a gun because the suspect volunteered that statement after changing the subject and a long pause); *Kramar*, 149 Wis. 2d at 790 (declining to suppress a custodial statement that was "an unsolicited, wholly spontaneous, volunteered action on the defendant's part").

¶35  The State does not meaningfully develop an argument that Keding's response was volunteered or nonresponsive, and I could reject it on that basis. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (appellate courts need not address undeveloped arguments). However, to the extent that the State is attempting to argue that Keding's somewhat surprising (and clearly unwise) response to Scheppler's question was so nonresponsive that it should be characterized as a volunteered statement not requiring *Miranda* warnings, I disagree. Keding's statement certainly constituted an overshare, but it was not spontaneous or nonresponsive—the statement was elicited by Scheppler's question

15

and was directly responsive to it. *Contrast **Kramar***, 149 Wis. 2d at 790. Our supreme court has rejected the notion that an incriminating admission offered by a suspect during the course of a custodial interrogation is admissible simply because that particular admission appears to have been "volunteered" when viewed in isolation. *See **Martin***, 343 Wis. 2d 278, ¶39.

¶36　For all these reasons, I conclude that Scheppler's first question constituted express questioning, and that the circuit court should have suppressed the statement Keding made in response. This is not to say that there was anything untoward about Scheppler asking Keding what he had thrown in the trash—the question was a reasonable and obvious one, and had I been in Scheppler's position, I would have likely asked the same question. Even so, the State is prohibited from using Keding's response—which was the product of a custodial interrogation that occurred without *Miranda* warnings—against him at trial.

¶37　Having concluded that Scheppler's first question constituted interrogation, I turn to Scheppler's second and third inquiries. To repeat, after Keding suggested that there might be "residue" on the tissue that he had thrown away, Scheppler prompted Keding to explain what he meant. Then, when Keding stated that the residue was cocaine, Scheppler asked "Some cocaine?" In response, Keding admitted that he had consumed cocaine at a bar earlier that night.

¶38　These are not close calls. I conclude that both questions amount to interrogation—Scheppler's inquiries were designed to elicit not merely incriminating responses but inculpatory ones.

¶39　The State's only argument to the contrary is its assertion that Scheppler's inquiries should not be categorized as "questions" because they were merely restatements of what Keding had just said. This argument is not persuasive.

16

Words, statements, and conduct that are the functional equivalent of express questioning constitute interrogation. *See **State v. Hambly***, 2008 WI 10, ¶46, 307 Wis. 2d 98, 745 N.W.2d 48 (lead op.) (interrogation can occur "without asking a single question"); *id.*, ¶105 (Roggensack, J., concurring); *id.*, ¶123 (Butler, J., concurring). Even if Scheppler's remarks were not inflected with a question mark, an objective reasonable observer would conclude that Scheppler's inquiries were reasonably likely to elicit a response from Keding that the State might seek to introduce at his trial. *See **Cunningham***, 144 Wis. 2d at 278. Indeed, although an officer's subjective intent is not dispositive in this inquiry, Scheppler testified that in "repeating" Keding's responses back to him, he was attempting to have a conversation with Keding about the cocaine. *See id.*, 144 Wis. 2d at 280 ("[W]here a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one in which the police should have known was reasonably likely to have that effect." (quoting ***Innis***, 446 U.S. at 302 n.7)).

¶40     For all these reasons, the circuit court erred by declining to suppress the statements Keding made to Scheppler in the police station.

## II.

¶41     Although the circuit court erred when it denied Keding's motion to suppress, that does not necessarily mean that the judgment of conviction in the possession case should be reversed. Reversal is not warranted if the error was harmless, and the error was harmless if there is not a reasonable probability that it contributed to the conviction. ***State v. Semrau***, 2000 WI App 54, ¶21, 233 Wis. 2d 508, 608 N.W.2d 375.

¶42    "In a [no-contest] plea situation following the [erroneous] denial of a motion to suppress," "the relevant inquiry is whether there is a reasonable probability that, but for the [court's] failure to suppress the evidence, the defendant would have refused to plead and would have instead insisted on going to trial." *Id.*, ¶22. Several non-exhaustive factors are relevant to this inquiry, including, among others, the relative strength and weakness of the State's case and the defendant's case; the persuasiveness of the evidence in dispute and whether it is cumulative of other evidence; the reasons, if any, expressed by the defendant for choosing to enter the plea; the benefits obtained by the defendant in exchange for the plea; and the thoroughness of the plea colloquy. *Id.*; *see also Armstrong*, 223 Wis. 2d at 370.

¶43    Here, the State is the party that benefited from the error, and it is therefore the State's burden to prove that the error was harmless. *See Martin*, 343 Wis. 2d 278, ¶45. However, the State does not make any argument about harmless error in its appellate briefing. The State's failure to develop an argument may not be especially surprising—there were three passengers in the car when it was pulled over; the bag of cocaine was found in the front passenger-side door; Keding was not seated in the front of the car and was instead in the back seat; and it does not appear from the record that any witness definitively linked the bag to Keding. The only evidence I am aware of that might suggest a link is Keding's admission, which should have been suppressed, that he had used cocaine earlier that evening. I therefore accept the State's silence on the topic of harmless error as a concession, and I conclude that the erroneous denial of Keding's motion was not harmless.

## CONCLUSION

¶44    For the foregoing reasons, the judgment of conviction in the bail jumping case, No. 2021CM617, is affirmed, the judgment of conviction in the

18

possession case, No. 2021CM318, is reversed, and the possession case is remanded to the circuit court for further proceedings.

*By the Court.*—Judgment affirmed; judgment reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.